

**SIGNED this 17th day of April, 2026**

*Rachel Ralston Mancl*
**Rachel Ralston Mancl**
**UNITED STATES BANKRUPTCY JUDGE**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

In re

HONEY DO FRANCHISING GROUP, INC.,

Debtor.

No. 2:24-bk-50596-RRM
Chapter 11 Subchapter V

# M E M O R A N D U M

APPEARANCES:

| | |
|---|---|
| Brenda G. Brooks, Esq. | Roland W. Baggott III, Esq. |
| Post Office Box 10024 | 4525 Harding Road, Suite 105 |
| Knoxville, Tennessee 37919 | Nashville, Tennessee 37205 |
| *Attorney for Debtor* | *Individually and as Attorney for Baggott Law, PLLC* |

Jason L. Rogers, Esq.
Post Office Box 869
Knoxville, Tennessee 37901
*Attorney for 5 Talents, Inc., and*
*its individual owners Jamey Bowling,*
*Gretchen Bowling, Brett Greene, and Amanda Greene*

**Rachel Ralston Mancl, United States Bankruptcy Judge.**   The debtor Honey Do Franchising Group, Inc., is a franchisor of businesses providing residential and commercial handyman services under the Honey Do trade name.   The debtor seeks confirmation of its plan of reorganization and to assume an unexpired commercial property lease for its place of business. Those efforts are opposed by 5 Talents, Inc., a former owner and operator of Honey Do franchises, and Roland W. Baggott III, who previously represented Honey Do in disputes with 5 Talents.[1] The hearing on these contested matters was conducted in five days but over the course of four months due to scheduling conflicts of the parties and their attorneys.   The court heard testimony from the debtor's principal officers, a business valuation expert retained by the debtor, and one of 5 Talents' owners.   Thirty-seven exhibits were received into evidence.   While not all the relevant evidence may be specifically mentioned in this opinion, all the relevant evidence was considered by the court in reaching its conclusion.   For the reasons set forth below, the plan will be confirmed and the debtor's motion to assume the commercial lease will be granted if the debtor accepts the changes to the plan enumerated in this opinion, the most significant being a 5-year term.   If the debtor does not accept the court's suggested changes to the plan, both confirmation of the plan and the motion to assume the commercial lease will be denied.   This is a core proceeding.   *See* 28 U.S.C. § 157(b)(2)(L) and (M).   The following constitute the court's factual findings and conclusions of law in accordance with Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.

I.

The debtor is a Tennessee corporation.   Thomas Bradley Fluke is the corporation's sole shareholder and chief executive officer.   His wife, Katharine Irene Fluke, is the corporation's chief operating officer.   Together the couple oversee the daily operations of the debtor, with Mrs. Fluke primarily focusing on financial and bookkeeping matters.   The debtor's revenue is mainly derived from royalties and fees collected from current franchisees.   At times revenue also comes

---

[1] 5 Talents, Inc., and its owners Jamey Bowling, Gretchen Bowling, Brett Greene, and Amanda Greene are referred to collectively as "5 Talents."   Roland W. Baggott III and his firm Baggott Law, PLLC, are referred to collectively as "Baggott."

from the sale of a new franchise.   To sell franchises the debtor must furnish to prospective franchisees a franchise disclosure document ("FDD") describing the franchisor's background and financial health and the legal obligations of both parties.   A sample franchise agreement and three years of audited financial statements are also part of the FDD.   The FDD must be updated annually, but the debtor missed the deadline to update the FDD in 2025 which has prevented the debtor from selling new franchises.   As a result, the debtor's revenue is presently dependent on royalties and fees received from existing franchisees that, according to the debtor's plan, are comprised of "10 franchisees who support 11 storefronts under 15 franchise agreements."

The Flukes have been employees of the debtor since 2008 when Mr. Fluke established the Honey Do corporation in Virginia.   In 2021 the debtor changed its state of incorporation to Tennessee and moved its headquarters from 433 Scott Street in Bristol, Virginia, to 704 Anderson Street in Bristol, Tennessee.   In 2023 the debtor relocated its headquarters again, this time to its present location at 1600 West State Street in Bristol, Tennessee.   The debtor leases its headquarters location from the Flukes' company Investment Properties Improvements, LLC.   The debtor has asked to assume its current lease if its plan is confirmed.   Like the present lease, the debtor's former locations were also leased from Mr. or Mrs. Fluke or from companies they owned.

5 Talents' business relationship with the debtor began in 2019 when 5 Talents purchased three existing Honey Do franchises covering the regions of Kingsport, Tennessee, Johnson City, Tennessee, and Bristol, Tennessee/Virginia.   The debtor and 5 Talents entered into new franchise agreements in 2020 that consolidated the agreement terms for these separate locations and added the region of Abingdon, Virginia.   The relationship turned acrimonious to such a degree that in January 2022, 5 Talents filed a lawsuit in the Chancery Court for Sullivan County, Tennessee, against the debtor, Mr. Fluke, and Freedom Enterprize, Inc., a company owned by Mr. Fluke that was a party to 5 Talents' purchase of the Bristol franchise.   Among other relief sought in the state court action, 5 Talents requested a declaration that each of the franchise agreements and the asset purchase agreement for the Bristol franchise were void.   The following month the debtor terminated 5 Talents' franchise agreements and, along with Mr. Fluke and Freedom Enterprize, instituted an arbitration proceeding for resolution of the parties' dispute.   The state court granted

3

the debtor's motion to compel arbitration of the issues raised in the state court litigation.   The debtor also filed a lawsuit against 5 Talents in the United States District Court for the Western District of Virginia seeking to enjoin 5 Talents' use of the Honey Do mark and related items.   The parties agreed to the entry of a permanent injunction that resolved the district court litigation.

An eight-day arbitration hearing was conducted in May and June of 2023 in Washington, D.C., after which the arbitrator found that the debtor had breached the franchise agreements by terminating them without an opportunity for cure, and that Mr. Fluke on behalf of the debtor had engaged in competitive activities causing a breach of the Bristol franchise asset purchase agreement.   An interim award in favor of 5 Talents was entered against the debtor in September 2023 in the gross amount of $1,123,086.   After deducting $344,086.68 that 5 Talents owed under the Bristol asset purchase agreement, the interim award was reduced to $778,999.32.   However, the final arbitration award in February 2024 adding 5 Talents' costs and attorney fees of $573,911.33 brought the total up to $1,352,910.65.   The following month the United States District Court for the Western District of Virginia confirmed the award and entered judgment for 5 Talents against the debtor in that amount plus interest at the judgment rate.

Concerned that 5 Talents would begin execution of the judgment, the debtor filed a chapter 11 bankruptcy petition on June 14, 2024, seeking to reorganize under subchapter V. 5 Talents, by far the largest creditor of the debtor, filed an unsecured claim in the amount of $1,382,796.82.[2]   Baggott filed an unsecured claim in the amount of $58,181.94 for legal fees in representing the debtor in the state and federal actions and in the arbitration proceedings.   Four other law firms also filed unsecured claims for representation of the debtor totaling $82,567.87.[3] The Tennessee Department of Revenue and Regions Bank were the only other creditors to file

---

[2] The interim and final awards along with the district court order confirming the total arbitration award are attached to 5 Talents' proof of claim.

[3] The unsecured claims were filed by The Hale Law Firm for $927.10, the firm of Nelson Mullins Riley & Scarborough LLP for $8,765, the firm of Ruberto Israel & Weiner, P.C., for $28,971.69, and the firm of Penn Stuart & Eskridge, P.C., for $1,690 and $42,214.08.

4

unsecured claims.    The Department of Revenue's claim of $35.67 is for penalty and interest associated with sales and use tax of which $1.82 is a priority claim.    The Bank's claim for $53,563.75 arises from a line of credit.

According to the plan, the other unsecured debts are those scheduled by the debtor for Barry Knepper CPA, Trinity Valuation Consulting Group, PLC, and Mr. Fluke in the respective amounts of $1,500, $18,523, and $78,583.91.    Regarding the debt owed to Mr. Fluke, the parties' joint prehearing statement filed on April 22, 2025, stipulates that "Thomas Bradley Fluke, the sole shareholder of the Debtor, holds a general unsecured claim in the amount of $78,583.91 that is not included in the total general unsecured claims pool amount."    From this stipulation the court concludes that the unsecured debt owed to Mr. Fluke will be subordinated to the remaining unsecured claims, and Mr. Fluke will not receive any payment on that indebtedness during the term of the plan.    Excluding the debt to Mr. Fluke from the pool, the unsecured debt addressed by the debtor's plan totals $1,597,169.05.    The debtor's only secured creditor is the United States Small Business Administration whose proof of claim in the amount of $512,708.66 states that it is fully secured by all the debtor's property.

The debtor filed its plan of reorganization and motion to assume its lease on September 12, 2024.    The plan divides non-priority unsecured claims into two classes—one for 5 Talents and one for all the others—and proposes to use all the debtor's disposable income to pay the claims pro rata over a 3-year term.    Both 5 Talents and Baggott challenge the debtor's liquidation analysis and insist that the plan has not been proposed in good faith.    On the latter issue, Baggott maintains that the debtor hid assets by not scheduling values for intangibles, and 5 Talents asserts that the debtor filed bankruptcy only to evade paying the judgment.    5 Talents and Baggott contend the debtor breached its fiduciary duty to maximize the estate, respectively, in not avoiding prepetition transfers and in failing to timely update its FDD.    5 Talents objects to its separate classification in the plan, questions the accuracy of the debtor's projected disposable income and expenses, and insists the plan is not fair and equitable in the treatment of 5 Talents' claim because the debtor is not paying projected disposable income over a maximum 5-year term.

5

The debtor's request to assume the lease at 1600 West State Street is made contingent on the plan being confirmed.   5 Talents, the only party to object to the debtor's assumption of the lease, does so on the basis that Mr. Fluke owns the lessor Investment Properties Improvements, LLC.   5 Talents points out that the debtor currently pays $1,935 per month in rent, significantly more than the $800 per month rent at its previous location, and that the debtor's disposable income projections show the rent increasing to $3,800 per month.   5 Talents states that "[s]uch self-dealing on the part of the Debtor appears contrary to the Debtor's obligations as a fiduciary to its creditors and beneficial only to the Debtor's insiders."

At the court's direction the parties formulated the disputed legal and factual issues to be decided by the court as follows:

1.   Whether the Plan complies with the applicable provisions of 11 U.S.C. §§ 101 et seq. as required by 11 [U.S.C.] § 1129(a)(1).

2.   Whether the [Proponent of the] Plan complies with the applicable provisions of 11 U.S.C. §§ 101 et seq. as required by 11 [U.S.C.] § 1129(a)(2).

3.   Whether the Plan has been proposed in good faith as required by 11 U.S.C. § 1129(a)(3)?

4.   Whether the plan meets the best interest test of 11 U.S.C. § 1129(a)(7).

5.   Whether the Plan is "fair and equitable" as required by 11 U.S.C. § 1191(b). As part of the "fair and equitable" requirement, whether the Debtor is committing all disposable income to pay its creditors; and whether the disposable income commitment period should be three or five years (§ 1191(c)-(d)).

6.   Whether the Court should approve the Debtor's Motion to Assume Unexpired Non-residential Property Lease (Doc. 122)?

During the hearing, Baggott also raised the question of whether the plan is feasible as required by 11 U.S.C. § 1129(a)(11).    In lieu of closing arguments, the parties submitted closing briefs.

II.

Considering the foregoing issues requires the court to determine whether the plan complies with the relevant portions of 11 U.S.C. § 1129(a), as incorporated by 11 U.S.C. § 1191(a).  These include § 1129(a)(1), whether the plan complies with the applicable provisions of this title; § 1129(a)(2), whether the proponent of the plan complies with the applicable provisions of this title; § 1129(a)(3), whether the plan has been proposed in good faith and not by any means forbidden by law; § 1129(a)(7)(ii), whether each holder of a claim of an impaired class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive if the debtor were liquidated under chapter 7; and § 1129(a)(11), whether confirmation is not likely to be followed by further reorganization or liquidation.  As required by § 1191(b), the court must also find that the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims that is impaired under, and has not accepted, the plan.  As for the remaining paragraphs under § 1129(a), numbers (8), (10), and (15) are rendered inapplicable by § 1191(b), and numbers (4), (5), (6), (9), (12), (13), (14), and (16) are satisfied because they are either factually inapplicable or not at issue.  With respect to those confirmation requirements that are at issue, the debtor bears the burden of proof by a preponderance of evidence that they are met.  *See, e.g., In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. 793, 808 (Bankr. W.D. Tex. 2024).

A.   <u>Whether the Plan Complies With the Applicable Provisions of the Bankruptcy Code</u>

Section 1129(a)(1) requires that the plan comply with the applicable provisions of title 11. 5 Talents asserts that the debtor's separate classification of its claim from that of other unsecured claims violates § 1122(a), and, for that reason, the plan does not meet the requirements of § 1129(a)(1).  Section 1122(a) states: "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  "Section 1129(a)(1) has been interpreted to be applicable to provisions of the Bankruptcy Code pertaining to the form and content of reorganization plans."  *In re PC Liquidation Corp.*, 383 B.R. 856, 866 (E.D.N.Y. 2008).  A bankruptcy court may deny confirmation of a plan under § 1129(a)(1) for improper classification

7

of claims. *See In re Multiut Corp.,* 449 B.R. 323, 333 (Bankr. N.D. Ill. 2011). "Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited." *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990).

Sections 2.03 and 2.04 of the plan separate unsecured creditors into Classes 3 and 4. Class 4 consists "of the nonconsensual Claim No. 3 of Five Talents, Inc." Class 3 consists of the claims of the unsecured creditors whose debts were consensually incurred, are not entitled to priority, and are not included in the definition of any other class, in other words, Class 4. Section 2.03 makes clear that Class 3 "includes claims of those creditors who filed a proof of claim, as well as those creditors Debtor scheduled and identified in the Attachment titled Table of Consensual Unsecured Claims." Section 7.03 of the plan provides that "[d]istributions to class 3 creditors whose claim is undisputed, will be paid pro rata from first available funds. Payments to Class 4 will commence following the final pro rata distribution to Class 3."

5 Talents states in its objection that "it appears that the only reason for separating 5 Talents into its own class apart from all other unsecured creditors is to manipulate class voting," presumably for the purpose of obtaining an impaired accepting class in satisfaction of § 1129(a)(10). While classification for the sole purpose of manipulating voting to obtain an impaired accepting class is one rationale for finding a classification scheme improper, *see, e.g., In re Bryson Props., XVIII,* 961 F.2d 496, 502 (4th Cir. 1992), § 1191(b) excludes § 1129(a)(10) as a requirement for subchapter V plans. As such, the placement of 5 Talents' claim into its own class cannot be considered as an attempt to manipulate class voting because the debtor does not have to obtain an impaired accepting class for confirmation.

Mrs. Fluke testified that the purpose for creating a separate class for 5 Talents is that 5 Talents will receive most of the distribution to unsecured creditors while distributions to the other unsecured creditors will be relatively small. She believes that it will be more efficient to issue fewer checks to other unsecured creditors and resolve those claims quickly after confirmation. Mrs. Fluke explained:

8

It seemed to make more sense administratively, I guess if you figure the amount of the payment, and the division of it, after about if my memory serves me right, three payments, the Class 3 would have been paid what they would have been owed under the bankruptcy and then as we continued on the rest of the payments would go straight on to 5 Talents, and it would eliminate me from having to cut a check for 52 cents for three years to a creditor.   Just logistically.

The court calculates that the quarterly distribution will be $3,130.25 under the 3-year term. 5 Talents will not receive any of the first quarterly distribution but will receive a partial distribution of $1,218.79 in the second quarter.   The remaining 10 quarterly distributions will all be to 5 Talents.[4]   This is only a short delay.   Section 1122(b) provides that "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." There being no concern that the separate classification for 5 Talents affects voting, and the rationale for the separate classification and treatment having been shown to be reasonable and necessary for administrative convenience, the debtor's classification in this manner is appropriate under § 1122.   Accordingly, the debtor has met the requirements for confirmation under § 1129(a)(1).

B.   <u>Whether the Debtor Complies with the Applicable Provisions of the Bankruptcy Code</u>

Section 1129(a)(2) states that the court may only confirm a plan if "[t]he proponent of the plan complies with the applicable provisions of this title."   "The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation

---

[4] The calculation is made by dividing the total for Class 4 of $1,382,796.82 by the total for both Classes 3 and 4 of $1,597,169.05 resulting in an 86.6% distribution to Class 4 and a corresponding 13.4% distribution to Class 3.   Multiplying the total amount to be distributed to Classes 3 and 4 of $37,653 by the 13.4% distribution to Class 3 results in $5,041.71, the total amount to be distributed to Class 3.   Dividing the total amount to be distributed to Classes 3 and 4 of $37,563 by the 12 quarters that the debtor will distribute payments results in $3,130.25 per quarterly distribution.

of acceptances of the plan." *In re Texaco Inc.,* 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988). *See also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("We agree with the District Court's conclusion that § 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125."); *In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 467 (Bankr. S.D. Ohio 2011) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2).") (quoting *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson),* 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992)). "The purpose of the disclosure provisions of Chapter 11 is to provide holders of claims and interests with 'adequate information' prior to the acceptance or rejection of a reorganization plan, in order for them to be able to make an informed judgment as to the feasibility of the plan." *In re Microwave Prods. of Am., Inc.*, 100 B.R. 376, 377 (Bankr. W.D. Tenn. 1989).

Compliance with § 1125 is inapplicable here. Because this is a subchapter V case, a disclosure statement was not required to be served with the plan when soliciting votes. *See* 11 U.S.C. § 1181(b) (Section 1125 is inapplicable unless the court orders otherwise.). Rather than argue that the debtor's disclosure was inadequate, Baggott takes the position that the plan cannot be confirmed because the debtor's schedules did not disclose its intangible assets—the mark, trade secrets, and goodwill of the Honey Do franchise system. In its schedule A/B the debtor responded "No" to question no. 59, "Does the debtor have any interests in intangibles or intellectual property?" The debtor's logo with the words "The Honey-Do Service Inc." and a picture of a handyman is a registered service mark. When asked why the debtor did not schedule the mark, Mrs. Fluke said that "I've never had a dollar amount applied to the logo in any fashion. There's no value to list." She went on to explain that the schedules prompt the debtor to value the assets in U.S. dollars, and that the debtor has never listed its mark as an asset on its balance sheet or otherwise assigned a value to it.

Baggott states in his reply to the debtor's closing brief that the debtor admits its "trademark and system of operations (intangibles) are assets of the Debtor *and* that those asset [sic] have value." The court agrees that the mark has value to the debtor because it sought and obtained an

10

injunction precluding 5 Talents from utilizing it.   Though its mark, trade secrets, and goodwill associated with the franchise system may have only intrinsic value in relationship to the debtor's operations, it would have been proper to schedule them in response to question no. 59, perhaps with the value listed as unknown or zero.   However, the failure to list them in response to question no. 59 is for the most part excused by the debtor's later disclosure under question no. 77, the catch-all provision of whether a debtor has any other property not previously listed.   In response to that question the debtor scheduled "projected average annual gross royalty revenues received under franchisee agreements" in the amount of $498,403.   The debtor's projected royalty revenue includes the intrinsic values of the mark, trade secrets, and goodwill that drive the debtor's royalty revenue stream.

One of the many criteria courts consider in evaluating the adequacy of disclosure statements, the traditional measure of compliance with § 1129(a)(2), is if the statement discloses available assets and their value.   *Id.* at 378.   As stated previously, the debtor was not required to provide a disclosure statement to creditors.   There is also no disclosure requirement of assets and their value in the official form plan for a small business debtor in a subchapter V case.   *See* Official Form 425A.   The 2020 committee note to the official form states in pertinent part:

> The form is amended in response to the enactment of the Small Business Reorganization Act of 2019, Pub. L. No. 116-54, 133 Stat. 1079.   That law gives a small business debtor the option of electing to be a debtor under subchapter V of chapter 11.   Because there will generally not be a disclosure statement in subchapter V cases, § 1190 of the Code provides that plans in those cases must include a brief history of the debtor's business operations, a liquidation analysis, and projections of the debtor's ability to make payments under the plan.   Those provisions are added to a new Background section of the form with an indication that they are to be included in plans only in subchapter V cases.

The debtor's plan includes a brief history of its operations, a liquidation analysis, and projections concerning its ability to make the payments under the plan.   The liquidation analysis attached to the debtor's plan lists not only the debtor's hard assets but also $98,905 generated from its franchise system operations, being the "present value of net cash flow of $128,085 over 36 months at a 9% discount rate."   As explained by the debtor in the analysis:

11

> The Debtor is a service industry.  Its primary asset is the net cash flow realized from royalty revenues.  These royalty revenues are only generated as a result of the Debtor's expenditures providing ongoing service to and maintenance of its franchisees under contract.

The debtor's franchise system of course utilizes the mark, trade secrets, and goodwill associated with the brand.  But the real value of those intangibles is only realized in the royalty revenue. Independent of the debtor's franchise operations, they have very little value.  In fact, the debtor's business valuation expert valued the mark at $1,500 based on replacement cost.

The debtor's failure to specifically schedule its mark, trade secrets, and goodwill was unintentional, accomplished nothing, and resulted in no harm.  The debtor was not "hiding" its intangibles as Baggott protests.  The intangibles were in plain sight as they comprise the very nature of the debtor's franchise system.  Baggott, who specializes in franchise and intellectual property law and previously represented the debtor, is uniquely aware of the debtor's franchise system and was not misled by the debtor's failure to schedule the intangibles utilized in the system. The court accepts Mrs. Fluke's explanation as to why the debtor failed to schedule its intangibles and that failure alone should not prevent the debtor from attempting to reorganize.  As one court has stated:

> Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code.  In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). […] Certainly, if Congress had meant that any infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993).  This court agrees and will not bar confirmation of the debtor's plan solely on the basis that it failed to specifically list intangible assets in its schedules.  The debtor has met the requirements of § 1129(a)(2).

C.    Whether the Plan has been Proposed in Good Faith

"Section 1129(a)(3) requires the Debtor to show that '[t]he plan has been proposed in good faith and not by any means forbidden by law.'"  *In re St. James Nursing & Physical Rehab. Ctr., Inc.*, 559 B.R. 186, 193 (Bankr. E.D. Mich. 2016).  "Good faith is determined based on the 'totality of circumstances' and in light of the Bankruptcy Code's purpose to provide debtors with a fresh start."  *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 549 (Bankr. E.D. Tenn. 1997) (quoting *In re Rivers End Apartments, Ltd.,* 167 B.R. 470, 475 (Bankr. S.D. Ohio 1994)).  "[Good Faith] is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984) (internal citations omitted).

Two primary purposes of chapter 11 are preservation of the business as a going concern and maximization of the value of the estate.  *See In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 (Bankr. S.D. Ohio 2021) (citing *In re Trenton Ridge Invs., LLC*, 461 B.R. at 468-69).  The question then is whether the debtor proposed its plan in an effort to achieve a result consistent with those purposes.  *See In re Dow Corning Corp.*, 244 B.R. 673, 675 (Bankr. E.D. Mich. 1999), *aff'd,* 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded,* 280 F.3d 648 (6th Cir. 2002).  If the plan has been proposed in good faith and not by a means forbidden by law, the requirements of § 1129(a)(3) are satisfied.  *Id.*  An examination of good faith in the proposal of a plan of reorganization is no different in subchapter V than it is in a standard chapter 11 case. *See In re Lapeer Aviation, Inc.*, No. 21-31500, 2022 WL 7204871, at *3 (Bankr. E.D. Mich. Oct. 12, 2022).

5 Talents' position is that the debtor's actions over the course of its business relationship with 5 Talents, then after the arbitrator's initial award, and now during this bankruptcy case demonstrate that the plan was not proposed in good faith.  Underlying this position are notions that Mr. Fluke placed the debtor in bankruptcy only to evade 5 Talents' judgment and that he and his wife have inappropriately benefited at the expense of creditors.  In its closing brief, 5 Talents chronicles what it considers were "years of mistreatment by the Debtor's owner" that led up to the bankruptcy filing.    The alleged conduct of Mr. Fluke and by extension the debtor has more to do

13

with whether the bankruptcy case was filed in good faith than whether the plan has been proposed in good faith. "By the time a case reaches the plan confirmation stage, pre-petition behavior is largely irrelevant. Instead, when considering whether a plan satisfies the § 1129(a)(3) requirement, the focus of the court must be on the plan itself." *In re Dow Corning Corp.*, 244 B.R. at 675. The issue is whether the debtor has proposed its plan with a legitimate rehabilitative purpose. *See In re Crosscreek Apartments, Ltd.*, 213 B.R. at 521 (citing *Matter of Madison Hotel Assocs.,* 749 F.2d 410, 425 (7th Cir.1984) (district court erroneously construed § 1129(a)(3) when it evaluated the prefiling conduct of the debtor as well as the feasibility of the plan itself)).

5 Talents cites the Sixth Circuit's factors in *Okoreeh-Baah* and *Laguana Associates* in support of its argument that the debtor's plan is not proposed in good faith. But those factors are well-suited to an examination of whether a chapter 13 plan has been proposed in good faith or whether a chapter 11 case has been filed in good faith. *See In re Okoreeh-Baah*, 836 F.2d 1030, 1031 (6th Cir. 1988) (suggesting a twelve-part test to determine whether a debtor's chapter 13 plan was proposed in good faith); *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 738 (6th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Sept. 9, 1994) ("Whether the debtor filed for relief in good faith is a discretionary determination that turns on the bankruptcy court's evaluation of a multitude of factors."). As discussed by the court in *Trenton Ridge Investors*, "[m]any of the parts of that 12–part test [of *Okoreeh-Baah*] that were developed to analyze good faith in the Chapter 13 context would not apply in the context of a Chapter 11 plan …. Nonetheless, the general principle enunciated in *Okoreeh–Baah*—that the Court must examine the totality of the circumstances to determine whether the plan satisfies the purposes of the particular chapter of the Bankruptcy Code under which the plan is to be confirmed—remains applicable in Chapter 11." *In re Trenton Ridge Invs., LLC*, 461 B.R. at 469. The court agrees. In examining good faith under § 1129(a)(3) to determine if the debtor's proposal of its plan satisfies the purposes of chapter 11, the parties' disagreements and skirmishes prior to the bankruptcy filing are considered in the totality of circumstances only as they concern the debtor's motives in proposing the plan. *Cf. In re Okoreeh-Baah*, 836 F.2d at 1033–34 ("[C]ourts should take into account the totality of the

14

circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a Chapter 13 plan.").

5 Talents states that "[t]he Debtor's eventual purpose is not truly to reorganize, but to evade the court order that awarded 5 Talents its judgment and is best summed up by Brad Fluke – 'We are filing bankruptcy based upon two real factors.   The judgment that was won in our opinion unfairly from 5 Talents and from the letter of termination that Mr. Roland Baggott put together that did not stand up.'"   It is not uncommon for a business owner on the losing end of litigation or arbitration to form an opinion that the outcome was unfair and that his or her attorney was blameworthy.   It is then not surprising that Mr. Fluke directed his frustration with the outcome in some way towards 5 Talents and Baggott.   But neither Mr. Fluke's opinion on the outcome nor his attitude tends to show that the debtor's "eventual purpose is not truly to reorganize, but to evade the … judgment" as 5 Talents urges the court to conclude.

5 Talents next asserts the debtor's exploration of bankruptcy before the final judgment was entered and the debtor's failure to make a reasonable offer of settlement after the final judgment was entered also prove that the purpose of the bankruptcy is only to evade the judgment. There was nothing improper by the debtor considering the option of reorganization during the course of the parties' dispute or thereafter.   Regarding attempts to settle, Mrs. Fluke stated that when considering reorganization, the debtor submitted a settlement offer of $36,000 to 5 Talents, to be paid at $1,000 a month over three years, which is close to the amount the debtor has proposed to pay all unsecured creditors under the plan.   Mrs. Fluke said that 5 Talents responded with a demand for $15,000 a month, although she was uncertain if it was for three years or until the judgment was paid in full.   In either event, Mrs. Fluke said that the debtor could not afford a monthly payment in the amount demanded by 5 Talents.   Mrs. Fluke testified that she sent financial documents to 5 Talents to justify the debtor's offer including balance sheets, profit and loss statements, and a list of franchisees.   "We sent them everything I could think of to say, 'this is what we have, this is what we can do' in the hopes of settlement."   Because the debtor had no means of paying the judgment of more than $1.3 million either from its assets or as a going concern, the debtor had little choice but to file chapter 11.   That the debtor could have managed

15

all its debts other than the judgment outside of bankruptcy does not prove the debtor has not proposed its plan in good faith. One of the primary purposes of chapter 11 is to preserve the business as a going concern, and that is being served by the debtor's bankruptcy filing and proposed plan of reorganization.

Concerning maximization of the estate, the other primary purpose of chapter 11, 5 Talents and Baggott respectively assert the debtor breached its fiduciary duty by not avoiding prepetition transfers and by not updating its FDD. 5 Talents paints the Flukes as "self-dealing" insiders that have intentionally engaged in acts designed to enrich themselves to the detriment of the estate and its creditors. 5 Talents points to the debtor's payment of all litigation and arbitration fees as an instance of the Flukes inappropriately benefitting at the creditors' expense. Specifically, the debtor did not seek contribution from co-parties Mr. Fluke and Freedom Enterprize. When questioned about this Mrs. Fluke stated, "I don't know, I never thought about that. Honey Do was the main entity in that; they're so intertwined." The debtor along with Mr. Fluke and Freedom Enterprize were all involved in the litigation and arbitration. The debtor was the principal party though as is evident from the arbitrator's awards against the debtor only. To the extent the debtor paid attorneys for the joint representation, no suggestion was offered by 5 Talents as to what amounts should be attributed to Mr. Fluke or Freedom Enterprize. Any claim that the debtor would have for contribution by Mr. Fluke or Freedom Enterprize for the attorney fees awarded to 5 Talents was foreclosed by entry of the arbitration award against the debtor alone. The attorneys that filed unsecured claims for fees from representing the debtor in the litigation and arbitration with 5 Talents may have also jointly represented Mr. Fluke and Freedom Enterprize but 5 Talents failed to offer any explanation as to how the debtor could successfully object to portions of the claims as being attributable only to the representation of Mr. Fluke or Freedom Enterprize and not to the debtor.

Another example 5 Talents offered to show that the debtor had chosen not to maximize the estate involved the evaluation of transfers that 5 Talents implied could be unwound for the benefit of creditors. 5 Talents questioned transfers by the debtor listed in its statements from Regions Bank covering the period from June 12, 2023, to May 4, 2024, that 5 Talents believed could be

16

recovered for the benefit of the estate. Of those transfers, Mrs. Fluke confirmed that in August 2023 during a vacation in Sturgis, South Dakota, the Flukes' personal expenses of $1,131.32 were paid out of the debtor's bank account as reproduced below:

| Sturgis, South Dakota Payments | | |
|---|---|---|
| Date | Description | Amount |
| 08/08/2023 | Card Purchase BP#5801261total 5542 Beresford SD | $39.19 |
| 08/08/2023 | PIN Purchase Pilot #599 5542 Murdo SD | $32.02 |
| 08/08/2023 | PIN Purchase Corner Pantry 5542 Sturgis | $44.21 |
| 08/10/2023 | Card Purchase American Lodge 3614 Chamberlain SD | $188.96 |
| 08/10/2023 | ATM Withdraw Pioneer Bank 2611 Lazelle Sturgis SD | $502.50 |
| 08/10/2023 | PIN Purchase Corner Pantry 5542 Sturgis | $42.27 |
| 08/11/2023 | Card Purchase City of Deadoo 7523 Deadwood SD | $2.00 |
| 08/11/2023 | Card Purchase City of Deadoo 7523 Deadwood SD | $2.00 |
| 08/11/2023 | PIN Purchase USPS PO 468172 9402 Sturgis SD | $222.18 |
| 08/14/2023 | Card Purchase Pizza Ranch St 5812 Sturgis SD | $15.25 |
| 08/14/2023 | Card Purchase Cenex Agland C0 5542 Parkston SD | $40.74 |
| Total: | | $1,131.32 |

Seeking recovery of these amounts under 11 U.S.C. § 548 would require a showing of actual or constructive fraud. There is no evidence the transfers by the debtor were made to hinder, delay, or defraud a creditor as required to prove actual fraud. For constructive fraud, i.e., the debtor received less than a reasonably equivalent value in exchange for the transfer, the transferor must have been insolvent on the date of the transfer or rendered insolvent by the transfer. There is no evidence that the debtor was insolvent when the transfers occurred or was rendered insolvent by them.

The debtor also made payments from the debtor's Regions bank account to Ally Bank for a GMC Yukon vehicle titled in Mr. Fluke's name. Mrs. Fluke testified that she had believed the debtor owned the vehicle. As to why, Mrs. Fluke explained that the debtor listed the vehicle as

17

an asset of the company and the debt on the vehicle as a liability of the company in its FDDs. Mrs. Fluke stated that the debtor stopped making payments on the vehicle when she realized in March 2024 that the vehicle was not a company asset while considering the possibility of trading it. She also offered that she would inform the debtor's accountant and attorney about the mistake so they could update future FDDs and tax returns and make amendments if necessary. The court accepts Mrs. Fluke's explanation that the payments were made due to an unintentional error. The payments that 5 Talents questioned are reproduced below.

| Ally Bank Car Payments | | | |
|---|---|---|---|
| Date | Description | | Amount |
| 06/12/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 07/11/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 08/10/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 09/12/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 10/10/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 11/06/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 12/12/2023 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 01/16/2024 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| 2/12/2024 | Ally | Ally Paymt Honey Do Franc 0005859721/001 | $1,025.81 |
| Total: | | | $9,232.29 |

Again, for any payment to be considered as a constructively fraudulent transfer, the debtor must have been insolvent when the transfer was made or rendered insolvent thereby. Assuming the debtor was rendered insolvent by the interim arbitration award entered in September 2023, the suspect transfers total $6,154.86.

5 Talents further questioned Mrs. Fluke about other transfers reflected in the Regions Bank statements for which she could not provide an explanation without referring to other records that were unavailable to her when testifying. Those transfers are reproduced below:

18

| Account Transfers | | |
|---|---|---|
| Date | Description | Amount |
| 07/25/2023 | EB to Checking # 0187487500 Ref 000000 8645127 | $7,168.83 |
| 08/21/2023 | EB to Checking # 0324888788 Ref# 000000 8643289 | $10,000.00 |
| 01/12/2024 | EB to Checking # 0320415168 Ref# 000000 8645218 | $5,000.00 |
| Total: | | $22,168.83 |

No evidence was elicited by 5 Talents to suggest the Flukes improperly benefited from the transfers.   Likewise, the Flukes were asked about shareholder distributions listed on the 2023 tax return that neither could readily explain.   Mrs. Fluke, who has a better understanding of the company's finances, stated, "I don't know when there was a Fluke loan or a shareholder distribution.   I do not know.   I know the records I keep in QuickBooks, anything going in and out I have in QuickBooks for those accounts. Why things look different on the tax return I don't know."   Mrs. Fluke also mentioned several times that she relied on professionals for the debtor's tax returns.   5 Talents implied that Mr. Fluke had received shareholder distributions after the debtor became insolvent but offered no proof of this.   The evidence that the court did receive regarding transfers to the accounts and the shareholder distributions on the 2023 tax return did not indicate the existence of a transfer that could be recovered by the debtor for the benefit of the estate.

Thus, only the payments of $6,154.86 on the vehicle in Mr. Fluke's name are suspect, and that is only because the debtor may have been insolvent when they were made.   In avoiding the transfers, however, any reasonably equivalent value received in exchange by the debtor would have to be considered along with any affirmative defenses that might be raised.   There was evidence that both Mr. and Mrs. Fluke used their personal vehicles for the debtor's business and that was obviously beneficial to the debtor.   Really, the most that has been shown is that the debtor's finances are closely intertwined with those of the Flukes.   This relationship has generally been mutually beneficial as is often the case with a closely held corporation.   For example, Mrs. Fluke testified that they personally funded $10,000 for the debtor's 2025 annual conference for

19

franchisees.   When asked how the debtor paid attorney fees for 2023, Mrs. Fluke said that Mr. Fluke covered a lot of those costs.   While the debtor does pay rent to a company owned by the Flukes, Mrs. Fluke testified that the rent is significantly lower than what the debtor would otherwise have to pay in the Bristol area.   And Mr. Fluke removed the indebtedness of $78,583.91 the debtor owes him from the pool of unsecured debt addressed by the plan.

5 Talents suggests that the debtor purposely prioritized the Flukes as insiders over creditors by increasing the Flukes' compensation in April 2024 after the debtor paid $1,500 to a bankruptcy attorney in December 2023.   The testimony does not suggest a causal connection between these events.   Mr. Fluke stated that after the interim arbitration award he had discussions with attorneys regarding bankruptcy.   Of the $1,500 payment, Mr. Fluke testified that "[t]his was the first lawyer to charge me money, and then we realized he didn't have the ability to manage this case."   Mr. and Mrs. Fluke did receive raises in April 2024 from an average of $34 per hour to $39 and $38 per hour, respectively.   Mrs. Fluke stated that neither she nor her husband had received any increase in their compensation since 2021.   Their hourly increases appear to have coincided with raises received by the debtor's other employees after their annual reviews because Mrs. Fluke, in explaining why the debtor's payroll projections increase in April 2025, stated that the "first quarter is when most employees' reviews fall, and they get raises so long as they are good employees."

The testimony the court heard about the Flukes' prior compensation primarily comes from 5 Talents' questions regarding the debtor's amended financial statement listing Mr. and Mrs. Fluke's respective "salaries" of $63,600 and $72,960 and "draws" of $21,904.01 and $3,855.29 during the year prior to the bankruptcy filing.   Although the draws were characterized as "Shareholder Withdrawals" for Mr. Fluke and a "Bonus" for Mrs. Fluke, the testimony indicates these were business credit card payments for personal expenses that the Flukes gave little thought as to how to categorize.   Mrs. Fluke answered that the draws were shareholder distributions but when asked to explain what that meant, she stated: "Mostly if he had just used the business card and it wasn't a business expense."   When asked if it was a common practice for Mr. Fluke to use the business credit card, she stated, "I don't know if it was a common practice, but with the amount of money that he had put in, as long as that it didn't exceed the money he wanted to spend, but

20

then it was all on the tax return, it ended up on Schedule K."   Similarly, for herself, she stated that "draws" meant she used the business credit card for personal expenses.   "At that time, my personal card and the business card were identical.   I know I have used the business card on occasion. I can't tell you what that is for."   When questioning Mr. Fluke about these draws and why Mrs. Fluke would receive them if they represented shareholder payments, Mr. Fluke stated that the draws for her were a "bonus for a job well done."

Considering the testimony, the "draws" listed in the amended statement of financial affairs could be classified as equity payments, loan repayments, or employee compensation.   At first, Mrs. Fluke described the credit card payments as "shareholder distributions," suggesting they represent payments to equity.   But her statement that Mr. Fluke justified using the business credit card based on "the amount of money that he had put in" suggests the use of the credit card may have been perceived as repayments on loans.   In any event, these payments could also be considered employee compensation, as evidenced by Mr. Fluke's statement that Mrs. Fluke's draws were a "bonus for a job well done."   However the payments are characterized, the court does not conclude that the debtor's prepetition adjustment of the Flukes' hourly pay in April 2024 points to a lack of good faith by the debtor in proposing the plan.

Adding the salary and draws together from the amended financial statement shows that Mr. Fluke received $85,504.01 and Mrs. Fluke received $76,815.29 in 2023 in the year prior to the bankruptcy filing, or a total of $162,319.30.   Comparing this total to what the Flukes will receive in compensation over the life of the plan, $39 per hour is annualized to $81,120, and $38 per hour is annualized to $79,040, so the total projected pay to the Flukes over the course of the plan will be $160,160 per year.   The amount of compensation the Flukes will receive is essentially the same amount of compensation, in fact slightly less, as the total previously received in both salary and their personal uses of the business credit card.   The court also considers the testimony from Mr. McMurray that the Flukes' compensation of $39 and $38 per hour is reasonable, and his opinion: "Obviously there's a lot of factors related to the size of the company and things like that that play into it, but certainly if you look at average COO and CFO positions that would be a lower range salary for most companies."

21

5 Talents asserts that Mrs. Fluke's creation of Crewbuilt Fixology also shows that the debtor is not maximizing the estate for creditors, noting Crewbuilt has not paid a franchise fee and does not pay rent to the debtor despite operating out of the same location.   Mrs. Fluke testified she created Crewbuilt to handle estimates and projects for two already existing Kingsport and Johnson City franchises after the owner David Tolbert surrendered those territories because he no longer wanted to operate in them.   According to the debtor, continuing operations there permits it to maintain the attractiveness and marketability of the territories.   Mrs. Fluke does not receive any income from Crewbuilt.   Crewbuilt uses a small space at the debtor's location for an office, and only the Crewbuilt employees are compensated.   5 Talents questioned the deposits that Crewbuilt made into the debtor's accounts reflected on the debtor's June 2025 operating report.   The report shows deposits of $1,513.46 into the marketing fund, $4,540.41 in royalties, and that it was invoiced $111.35 from the Shopify account.   The deposits evidence that Crewbuilt is benefiting the debtor and the debtor's creditors, as it preserves a source of revenue from the territories in which Mr. Tolbert no longer desired to operate.   The debtor plans to market the two franchises once its FDD is updated.

Baggott's position with respect to the debtor's alleged breach of fiduciary duty in failing to maximize the estate concerns the debtor's FDD and the plan's lack of any projected revenue from sales of new franchises.   The Flukes testified that the debtor's impaired ability to sell new franchises was due to having to disclose its unresolved bankruptcy, and that the debtor had planned to wait on updating its FDD until its plan was confirmed.   Baggott rejects this reasoning and instead claims that the debtor's delay in updating the FDD is "part of its bankruptcy strategy" because "[t]he abandonment of new franchise sales minimizes the projected income of the Debtor and, consequently, minimizes the planned payments to the unsecured creditors (on whose backs the Debtor is trying to reorganize)."   Baggott states that the "arguments about sales being impacted such that no revenue would be reasonably projected from new franchise sales are nothing more than speculation, at best.   Realistically, they are part of the deception being committed by the Debtor and are designed to take advantage of the Court based on the Debtor's presumption that this Court is not familiar enough with franchising and will believe their lies."   The court disagrees

22

with this assessment and characterization.   The premise of Baggott's argument is that the Flukes would rather impoverish the company, and by extension themselves, than pay creditors from any net revenue generated by the sale of a franchise.   The only fact that Baggott offered in support of this premise, that the debtor managed to sell a franchise during its bankruptcy, undercuts his argument that the debtor breached its fiduciary duty to maximize the estate by abandoning sales of franchises.   The court accepts the debtor's reason for a delay in updating its FDD.

5 Talents makes another argument that the debtor has not maximized the estate for the first time in its closing brief.   5 Talents calls attention to an assumption agreement between the debtor and the SBA made within 90 days prior to the bankruptcy filing that led to the debtor's granting of a security interest to the SBA and the SBA's filing of a UCC-1 in Tennessee to perfect the interest.   At no point prior to or during the confirmation hearing did 5 Talents articulate that the perfection of the SBA's security interest in Tennessee might be preferential.[5]   5 Talents did question Mr. Fluke about the SBA's proof of claim.   After directing Mr. Fluke's attention to the original and modified notes that are a part of the SBA's proof of claim, 5 Talents asked Mr. Fluke why the debtor needed the loan when it was initially taken out in 2020 and then increased in 2021. Mr. Fluke stated that "we were coming out of COVID and our government was allowing business people to protect themselves from some of the unknowns, we took full advantage of taking that loan."   Mr. Fluke was then directed to the attached assumption agreement and asked if he could "tell me why you signed this document approximately 6 weeks before Honey Do filed this bankruptcy?"   Mr. Fluke answered, "Not exactly, I would assume it would have to do with filing this bankruptcy."   Mr. Fluke had similar responses to the subsequent questions about why he

---

[5]   In the parties joint statement 5 Talents stipulated without a caveat that "[t]he only secured creditor is the U.S. Small Business Administration, which filed Claim No. 2 as amended, as a secured claim in the amount of $512,708.56" and that "[t]hrough a Security Agreement dated April 30, 2024, and the UCC-1 Financing Statement filed with the Tennessee Secretary of State on May 1, 2024, the U.S. Small Business Administration has a blanket security interest encumbering all of the tangible and intangible personal property of the Debtor securing payment of its $512,708.66 claim."

signed the security agreement in connection with the assumption agreement and why the SBA filed the UCC-1 first in Virginia with the loan origination and then in Tennessee a few weeks before the bankruptcy filing.  He simply did not know.  It was apparent to the court that Mr. Fluke did not understand the purpose or significance of the assumption agreement, the security agreements, or the UCC-1s and just relied on the debtor's professionals for direction in such matters.

No other facts were developed concerning why the SBA considered the debtor's assumption of the loan as necessary, who or what prompted the transaction in the days before the bankruptcy filing, or what consideration was exchanged, if any.  The only facts that the court does have are from the attachments that are a part of the SBA's original and amended proofs of claim. They show that the debtor obtained an SBA 30-year disaster loan of $150,000 in April 2020.  On August 2, 2021, the loan was modified to increase the amount to $500,000.  On each occasion the debtor executed a security agreement granting the SBA a blanket security interest covering all the debtor's tangible and intangible personal property.  When the loan originated the SBA filed a UCC-1 to perfect its security interest with the Virginia State Corporation Commission on May 18, 2020.  When the loan was modified in August 2021 the debtor had already reincorporated in and moved to Tennessee.[6]

On May 1, 2024, an "Assumption of Liability Agreement" was executed by three parties, "Honey Do Franchising Group Inc, a Tennessee Corporation, … as  'Assumptor', Honey Do Franchising Group … as 'Borrower', and US Small Business Administration … as 'Lender'."  In the agreement the SBA consented to the assumption of the loan obligations by the Assumptor provided that the "**Assumptor and the original Borrower and Debtor shall remain bound** by the terms of the promissory Note, Loan Authorization and Agreement, Security Agreement, and Security Instruments in the same manner as though the Assumptor had joined in the original

---

[6] Mrs. Fluke agreed during her testimony that the Tennessee incorporation and relocation occurred prior to the debtor's FDD dated May 24, 2021, because it states that "Honey Do Franchising Group, Inc. … is a Tennessee corporation that was incorporated on September 11, 2008 and has its principal place of business at 704 Anderson Street, Bristol, Tennessee 37620."

execution thereof." In connection with the assumption agreement the debtor signed another security agreement again granting the SBA a blanket security interest on all the debtor's tangible and intangible property. The SBA filed a UCC-1 to perfect the security interest with the Tennessee Secretary of State on May 1, 2024. The "Loan Authorization and Agreement" referenced in the assumption agreement is not included in the attachments to the SBA's proof of claim.

Perhaps it was not until 2024 that the SBA became aware of the debtor's reincorporation in and relocation to Tennessee. When the 2021 modification of the loan occurred, it certainly appears that the SBA was not aware that the debtor had already changed its place of incorporation and location from Virginia to Tennessee. Indeed, from the definitions assigned to the three parties in the assumption agreement it seems that the SBA still believed in 2024 that the "Borrower" signing the 2021 loan modification was both incorporated in Virginia and located there. That the SBA may not have known of the debtor's ties to Tennessee in 2021 is understandable. Mrs. Fluke testified that the move to Tennessee was for done for tax reasons. The change of incorporation from Virginia to Tennessee and business locations from Bristol, Virginia, to Bristol, Tennessee, probably would not be apparent as the debtor has presented itself as the same entity since the company's founding in 2008. The corporate name did not change. The Flukes remained in the same capacity as officers of the debtor. The debtor's financial statements from 2020 and 2021 are consistent in their reference to only one entity.[7] Even the factual history compiled by the arbitrator for the arbitration between the debtor and 5 Talents made no distinction between the

---

[7] The independent auditor's notes for the debtor's 2021 end-of-year financial statements included in Exhibit F to the debtor's FDD issued August 21, 2023, recite that "Honey Do Franchising Group, Inc. ("the Company") is a corporation organized under the laws of the State of Virginia through 2020, and Tennessee effective in 2021." The audited financial statements each have a comparison of years 2020 with 2021 without any notation that any financial operations changed during those two years.

obligations of the Virginia corporation and the Tennessee corporation even though the franchise agreements were made while the company was a Virginia corporation but breached after the company had reincorporated in Tennessee. Finally, moving between the twin cities of Bristol, Virginia, and Bristol, Tennessee, is as simple as crossing State Street.

The security agreement granted by the debtor to the SBA in connection with the original loan was not included as a part of the SBA's proof of claim. The court would be surprised though if did not contain the same standard provisions as in the ones granted by the debtor in 2021 and 2024, including those in paragraphs 6 and 7 titled "Maintenance and Location of Collateral; Inspection; Insurance," and "Changes to Borrower's Legal Structure, Place of Business, Jurisdiction of Organization, or Name." Under the pertinent provisions of those paragraphs the "Borrower must promptly notify Secured Party by written or electronic communication of any change in location of the Collateral, specifying the new location," and "Borrower must notify Secured Party by written or electronic communication not less than 30 days before taking any of the following actions: (a) changing or reorganizing the type of organization or form under which it does business; (b) moving, changing its place of business or adding a place of business; (c) changing its jurisdiction of organization; or (d) changing its name." If the SBA had not been timely notified by the debtor of changes in its state of incorporation and location as required by the terms of paragraphs 6 and 7, a default could have occurred under paragraph 9 of the security agreement that states the "Borrower is in default under this Agreement if: (a) Borrower fails to pay, perform or otherwise comply with any provision of this Agreement…."

The original note is also not a part of the SBA's proof of claim but the modified note which is likely similar states in paragraph 7 that the "Borrower is in default under the Note or any modification to the Note, if Borrower … [f]ails to comply with any provision of the Note, the Loan Authorization and Agreement, or other Loan Documents…." As defined in paragraph 6(C) of the modified note, "'Loan Documents' means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral." Therefore, a default in the loan could have been triggered. If so, the debtor may have been faced with an acceleration of the 30-year repayment of the $500,000 indebtedness if it did not assume the obligations of the loan as a

26

Tennessee entity.   For whatever purpose, the court does not see any reason to infer that the debtor's business judgment in agreeing to the assumption was not exercised in good faith even though it occurred shortly before the bankruptcy filing.

That the debtor's business judgment to enter into the assumption was exercised in good faith, however, does not foreclose 5 Talents' argument as it concerns the potential for avoidance of the SBA's lien perfection.   On this point the debtor and 5 Talents dispute what if any effect the debtor's change in location and state of incorporation had on the perfection of the SBA's security interest and, therefore, what practical effect an avoidance of the 2024 grant of the security interest or its perfection would have on the estate.   The debtor insists that an avoidance action would have no benefit because the 2024 security agreement did not give the SBA anything it did not already have, and the perfection in Virginia would still be effective if the perfection in Tennessee was avoided.   The debtor believes that by application of Tenn. Code Ann. § 47-9-307(e) and (g) "the Debtor continued to be located in the state of Virginia for the purposes of the SBA loan and security interest."   5 Talents cites Tenn Code Ann. § 47-9-316(a)(2) for its position that the security interest perfected pursuant to the laws of Virginia remained effective only until "[t]he expiration of four (4) months after a change of the debtor's location to another jurisdiction," which in this case would run from the debtor's relocation to Tennessee.   The court does not have any facts about the transformation of the debtor from a Virginia corporation to a Tennessee corporation. Did it occur by transfer between the two or by merger?[8]   If by merger, the following example in paragraph 2 of the Uniform Commercial Code Comment to § 9-316 offers guidance:

> **Example 4:**   Debtor is a Pennsylvania corporation. On January 1, Lender perfects a security interest in Debtor's equipment by filing in Pennsylvania. Debtor's shareholders decide to "reincorporate" in Delaware. On March 1, they form a Delaware corporation (Newcorp) into which they merge Debtor. The merger effectuates a transfer of the collateral from Debtor to Newcorp, which thereby becomes a debtor and is located in another jurisdiction.   Under subsection (a)(3),

---

[8] It does not appear that Tennessee provides a means for the domestication of a foreign corporation as it does for a foreign LLC.   *Compare* Tenn. Code Ann. § 48-21-109 *with* Tenn. Code. Ann. § 48-249-703.

27

the security interest remains perfected for one year after the merger.    If a financing statement is filed in Delaware against Newcorp within the year following the merger, then the security interest remains perfected thereafter for a period determined by Delaware's Article 9.

UCC Comment to Tenn. Code Ann. § 47-9-316.

Despite the lack of evidence at this juncture concerning the avoidability of the perfection of the SBA's security interest in Tennessee, the issue is not foreclosed if the debtor's plan is confirmed.   "Because it is often not practical or even possible to litigate all preference actions before confirmation of a plan, it has long been recognized that the Chapter 11 plan can reserve the right of the reorganized debtor to bring preference actions after confirmation, thereby overcoming the *res judicata* effect of confirmation. This power of preservation is codified in 11 U.S.C. § 1123(b)(3)."   *The Elk Horn Coal Co. v. Conveyor Mfg. & Supply, Inc., (In re Pen Holdings, Inc.)* 316 B.R. 495, 498–99 (Bankr. M.D. Tenn. 2004).   "The words sufficient to satisfy § 1123(b)(3) must be measured in the context of each case and the particular claims at issue:   Did the reservation allow creditors to identify and evaluate the assets potentially available for distribution?"   *Id.* at 504.   The debtor's plan provides for the retention of avoidance actions after confirmation.   The pertinent sections are as follows:

> 8.06 <u>Retention of Jurisdiction of the Court</u>. Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction over this Chapter 11 Case and any proceeding related thereto pursuant 11 U.S.C. § 1142 and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to implement the Plan.   Without intending to limit the generality of the foregoing, the Court shall have exclusive jurisdiction:
>
> > ….
>
> > (d) To determine any and all applications, adversary proceedings and litigated matters that may be filed in this Court[.]
>
> ….
>
> 8.08 <u>Retention of Claims</u>.   Pursuant to § 1123(b)(3)(B) of the Code, the Debtor shall retain each and every claim, demand or cause of action whatsoever which the Debtor may have had power to assert immediately prior to Confirmation, including without limitation, actions for the avoidance and recovery pursuant to

28

§ 550 of the Code of transfers avoidable by reason of §§ 544, 545, 547, 548, 549 or 553(b) of the Code.

….

8.13 <u>Preservation of Claims and Causes of Action</u>.   The Debtor retains and reserves all causes of action. It is the intent of the Debtor that this reservation of claims shall be as broad as permitted by applicable law and shall include all claims, whether or not disclosed in the Debtor' [sic] schedules or this Plan. The Debtor shall have the widest possible latitude in deciding whether or not to pursue any possible cause of action, including without limitation any preference or other avoidance action. Except as expressly provided in the Plan, the Confirmation order shall not bar the Debtor by res judicata, collateral estoppel or otherwise from collecting, prosecuting or defending any matter, avoidance action, or cause of action.   <u>Any and all creditors identified in Questions 6 and/or 7 to Debtor' [sic] Statement of Financial Affairs in this Chapter 11 case, which includes all creditors receiving payments from the Debtor in the 90 days preceding the Petition Date and insiders receiving payments in the year preceding the Petition Date that aggregated at least $6,425.00, may be the defendant of an avoidance action or other cause of an avoidance action or other cause of action…. Each creditor and party in interest is advised to review closely the Plan, the Debtor' [sic] filed Schedules, and Statement of Financial Affairs to determine whether any cause of action or avoidance action may be pursued against it.   Avoidance actions to recover preferences pursuant to Section 547 of the Code may exist against every person who received a payment from the Debtor within 90 days prior to the Petition Date.</u> (Emphasis supplied.)[9]

In this instance the language above in section 8.08 of the debtor's plan providing that the debtor retains "each and every claim, demand or cause of action whatsoever which the Debtor may have had power to assert immediately prior to Confirmation, including without limitation, actions

---

[9] The court observes that the reference to question nos. 6 and 7 in section 8.13 emphasized above are those that require a debtor to "List Certain Payments You Made Before You Filed for Bankruptcy" in Official Form B107 for individual debtor cases.   In Official Form B207 for nonindividual debtor cases as the one filed by the debtor, the applicable questions requiring a debtor to "List Certain Transfers Made Before Filing for Bankruptcy" are nos. 3 and 4. Additionally, at the time this case was filed the applicable minimum aggregate value of property that may be recovered as a preference was $7,575.   *See* 11 U.S.C. § 547(c)(9).

29

for the avoidance and recovery pursuant to § 550 of the Code of transfers avoidable by reason of §§ 544, 545, 547, 548, 549 or 553(b) of the Code" is broad enough to include an avoidance action against the SBA.   The plan does not have to specifically identify the SBA as a target of an avoidance action to preserve such an action after confirmation so long as the reservation language is unambiguously clear.   *See, e.g., In re Pen Holdings, Inc.*, 316 B.R. at 505 ("Nothing in § 1123(b)(3) suggests such specificity is required.").   But in any event the advisement to creditors emphasized above in section 8.13 that they "review closely the Plan, the Debtor' [sic] filed Schedules, and Statement of Financial Affairs to determine whether any cause of action or avoidance action may be pursued against it" would put the SBA on notice of the potential for an avoidance action.   In its statement of financial affairs the debtor, in answer to question no. 3 concerning payments in the 90-days prior to the filing of the petition, lists the monthly payments of $2,512 in April, May, and June 2024 to the SBA totaling $7,536.

If the factual and legal bases for a preference action against the SBA do exist, then the question becomes whether after confirmation the debtor will have both the incentive to pursue such an avoidance action and the means for litigating it.   As to the incentive, the debtor may be conflicted.   Mr. Fluke is the owner and chief executive officer of the debtor, and it stands to reason that he would have the last word in any decision to pursue an action against the SBA to avoid perfection of its lien.   The plan provides for treatment of the SBA's claim in Class 2 as follows:

> Any default is deemed cured and any post-petition/pre-confirmation default will be paid at the end of the Note term.   The Debtor will resume payments of $2512.00 per month pursuant to the terms of the Note….   The SBA shall retain the lien securing claim no. 2, as amended, until the claim is paid in full.

If the SBA's claim were instead paid pro rata with other unsecured claims, Mr. Fluke, being jointly liable with the debtor on the SBA loan, probably as a guarantor rather than a coborrower since he was not individually a part of the assumption agreement, could be exposed to a demand under a guaranty.[10]

---

[10] Nothing in the attachments to the SBA's proof of claim indicates that anyone other than the debtor is liable on the debt.   However, the debtor's schedules verified by Mr. Fluke as chief

30

Also, it could be that the debtor sees no net benefit to the estate for an avoidance action after weighing the costs of litigation.   Or maybe the debtor just does not have the financial means to litigate an action against the SBA because the expense could well exceed the $37,563 of the debtor's projected income designated to pay on unsecured claims.   At this stage, even if factual and legal bases for the avoidance action were assumed, the court cannot know if the avoidance would increase the estate's value because there was no evidence offered as to the range of costs for litigating an avoidance action with the SBA.   *Cf. In re One2One Commc'ns, LLC*, No. 12-27311 (NLW), 2014 WL 3882467, at *4 (Bankr. D. N.J. Aug. 7, 2014) (finding expert witness's opinion unpersuasive regarding potential value of preferential transfers, in part because he did not consider the costs of pursuing such claims).

In any event, "derivative standing may be necessary in Chapter 11 proceedings where typically there is not an independent trustee and thus it is the debtor ('debtor-in-possession') who generally decides whether to bring an avoidance action."   *In re Trailer Source, Inc.*, 555 F.3d 231, 243 (6th Cir. 2009).   The Sixth Circuit Court of Appeals "noted in *Gibson Group* that 'a debtor-in-possession often acts under the influence of conflicts of interest and may be tempted to use its discretion as a sword to favor certain creditors over others, rather than as a tool to further its reorganization for the benefit of all creditors as Congress intended.'" *Id.*   (quoting *Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.),* 66 F.3d 1436, 1441 (6th Cir. 1995)).   And "even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself," making derivative standing necessary.   *In re Nat'l Forge Co.*, 326 B.R. 532, 542 (W.D. Pa. 2005).   A trustee or debtor-in-

---

executive officer identify Mr. Fluke as a codebtor on the SBA loan.  In schedule D the SBA is listed as the debtor's sole secured creditor, having a blanket lien on all the debtor's assets.  The debtor answers affirmatively to whether there "[i]s anyone else liable on this claim?"  In schedule H the debtor lists Mr. Fluke as a codebtor on the debt of the SBA scheduled in D and as a codebtor on the unsecured debts owed to Baggott, Ruberto Israel & Weiner, P.C., Penn Stuart & Eskridge, P.C., Regions Bank, and Trinity Valuation Consulting Group, PLC, listed in schedule E/F.

31

possession may also consent to derivative standing.  *See In re Racing Servs., Inc.*, 540 F.3d 892, 904-05 (8th Cir. 2008); *see also In re Full Spectrum Mgmt., LLC*, 621 B.R. 421, 428 (Bankr. W.D. Mich. 2020) (quoting *Isaacs v. DBI-SG Coinvestor Fund III (In re Isaacs)*, 895 F.3d 904, 916 (6th Cir. 2018) (The Sixth Circuit has noted "the 'flexible equitable power' of bankruptcy courts to craft remedies in situations where a trustee cannot or will not pursue a claim.")).

The plan has mechanisms in place to deal with a challenge to the secured status of the SBA's claim if an avoidance action is successfully brought.  Section 2.02 of the plan states that Class 2 "shall consist of the claim of the U. S. Small Business Administration, to the extent allowed as a secured claim under § 506 of the Code."  In addition to consensual unsecured claims, Section 2.03 states that Class 3 "shall consist of … each allowed claim secured by a lien on property in which the Debtor [has] an interest to the extent that such claim is determined to be unsecured pursuant to 11 U.S.C. § 506(a)."  Under section 4.02 titled "Terms Applicable to All Classes of Secured Claims unless stated otherwise," paragraph d) states that only "[i]f a holder of an Allowed Secured Claim has a properly perfected Lien (that the Debtor does not avoid), then such holder shall retain its Lien(s) until paid in full as provided for in the Plan."  The following paragraph f) provides that "[n]o payments shall be made on account of any Secured Claim if such claim is not an allowed claim."  And section 5.01 states that "[t]he Debtor or any party in interest may file an objection to any claim in any class on or before the first anniversary of the Effective Date." (Emphasis supplied.)

To remove any confusion or ambiguity the court will require that the plan be amended to state that the debtor's ability (or that of any representative through derivative standing) is expressly preserved to challenge the secured status of the SBA in any avoidance action that may be filed. The court notes that the time for commencing such an action imposed by 11 U.S.C. § 546(a) will not run until two years after the debtor's bankruptcy filing on June 14, 2024.  5 Talents still has time to demand the debtor pursue the action and, in the event the debtor either fails to do so or consents to 5 Talents' doing so, file a motion seeking derivative standing to pursue the avoidance action on behalf of the estate at its own expense that will be heard on an expedited basis.  *See, e.g., In re Full Spectrum Mgmt., LLC*, 621 B.R. at 427 (applying the factors enunciated by the

32

Sixth Circuit in *In re The Gibson Group, Inc.,* 66 F.3d at 1446).   If 5 Talents is granted standing to pursue the action and is successful in enlarging the estate from the avoidance action, it may assert an administrative expense claim against the estate for the expenses of the litigation. Because of the possibility of a postconfirmation avoidance action, the court will require that the plan be amended to provide that property of the estate will not vest in the debtor and substantial consummation will not occur until after the expiration of the limitations period set forth in § 546(a) or the final resolution of any avoidance action commenced before that expiration.   Finally, the court will require that the plan provide that in the event the SBA will not be paid as a secured creditor under the plan, section 7.03 of the plan is modified to provide for concurrent distributions to Classes 3 and 4 instead of Class 3 being paid from first available funds.

In conclusion, the court found the Flukes to have been open, honest, and forthcoming in their testimony during the hearing.   The debtor's motives in formulating the plan appear to be a sincere attempt of reorganization to preserve the company that will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.   The evidence establishes that the debtor must be reorganized to sustain its business, and reorganization is the most effective way to create value for creditors.   Concerning its fiduciary duty to maximize the estate for the benefit of creditors, the court finds no breach.   5 Talents' assertion that the SBA's secured status may be avoided to increase the estate has not been foreclosed.   Considering the totality of the circumstances discussed above and as required by § 1129(a)(3), the plan has been proposed in good faith and not by any means forbidden by law.[11]

D.   Whether the Plan Satisfies the "Best Interests of Creditors Test"

5 Talents and Baggott assert that they will not receive under the plan what they otherwise would if the debtor were liquated in a chapter 7 case.   Section 1129(a)(7) requires that the holder of a claim who has not accepted the plan "receive, under the plan, at least what they would have

---

[11] Baggott asserted that the debtor's failure to specifically schedule its intangibles on schedule A/B shows the debtor has not proposed the plan in good faith.   This assertion is rejected for the same reasons as discussed above in Part B.

received if the debtor were to liquidate under Chapter 7." *In re Christian Faith Assembly*, 402 B.R. 794, 799 (Bankr. N.D. Ohio 2009) (quoting *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. La Salle St. P'ship*, 526 U.S. 434, 441 n.13 (1999)).  "Applying the best interests of creditors test requires the Court to 'conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan.'" *Matter of Edgewood Food Mart, Inc.*, 666 B.R. 418, 435 (Bankr. N.D. Ga. 2024) (quoting *In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000)). "In this analysis, the Court considers the value of the assets and the costs of sale … along with the Chapter 11 and Chapter 7 administrative expenses." *Id.* (citations omitted).  The hypothetical "chapter 7 liquidation may be done either under 'forced sale' conditions or as a going concern." *In re Lason, Inc.*, 300 B.R. 227, 233 (Bankr. D. Del. 2003).  As the *Lason* court concluded, however, while a liquidation analysis may include the sale of a company as a going concern by a chapter 7 trustee, such a sale may not be feasible in cases where the business is "firmly based on key employees and customers' good will." *Id.* at 234.  The debtor's business was founded and built on the Flukes' relationships with the franchisees, making it the type of business that would be difficult to sell as a going concern without the Flukes remaining at the helm of management for a significant transition period.

The debtor's business valuation expert, Travis McMurray, is a certified public accountant and owner of Touchstone Valuation, PLC, that began operating in 2014.  He described his previous background as including 31 years as a CPA with Blackburn, Childers, & Steagall, PLC, 20 of which he spent as a partner, that involved business valuations, litigation support, transaction consulting, and tax advising.  Mr. McMurray said his experience in business valuations including as a going concern and by forced sale dates back to 2002 or 2003.  He received his accreditation in business valuations in 2009 from the American Institute of Public Accountants.  The court found Mr. McMurray to be well-qualified to value the debtor's business.

As set forth in his report, Mr. McMurray provided an opinion of a reasonable estimate of the fair market value of the 100% common stock interest in the debtor.  The value was derived using a capitalization of cash flow method.  As explained in the report:

> Capitalization of cash flow requires an estimate of an ongoing benefit stream and a capitalization rate.  The capitalization rate represents the required rate of return minus the sustainable growth rate.  Capitalization of cash flow effectively determines the present value of the Company's ongoing economic benefit stream growing perpetually at a fixed rate and discounted at the required rate of return. The present value is representative of the amount a willing buyer and willing seller would exchange for the business.

Using a benefit stream from the franchise contracts of $9,200, a growth rate of 2.5%, a capitalization rate of 15.82%, and a marketability discount of 19% (due to lack of a secondary market in which to negotiate a quick sale), the value of the debtor was calculated to be $48,000. The report further states:

> Based on the fair market value calculation, the current assemblage of assets generates an economic benefit that is valued at $48,000.  This economic benefit is driven primarily by the intangible assets of the company such as contracts, trademarks, operating systems, and workforce in place.   Of these intangible assets, the contracts are the only assets that directly result in revenue and therefore economic benefit.  The trademark, operating systems, and workforce in place all serve to support the contracts.   Apart from the contracts, the value of the intangible assets would most appropriately be valued at a replacement cost – or what would it cost to recreate that specific asset?
>
> Based on my analysis, the replacement costs are as follows:
> Development of new logo/trademark        $1,500
> Recruitment of qualified staff                $10,000
>
> By extracting the value of these assets, the remaining value is attributed to the contracts.
> Total Value                                             $48,000
> Less Identified Replacement Costs           $11,500
> Value of Contracts                                  $36,500

Mr. McMurray also concluded in his report that "[t]he adjusted book value in an orderly liquidation of [the debtor] as of December 31, 2024 was $0."   Mr. McMurray's opinion was based on the debtor's balance sheet as of December 31, 2024, that lists total assets of $161,008 and total liabilities of $2,491,043.   When asked during the hearing why the liquidation value was $0, Mr. McMurray explained that even if "you adjusted all the assets to fair market value …, it's still

insolvent from a liquidation standpoint." It was clear that Mr. McMurray was only concerned that liabilities exceeded assets, an insolvency test, because he did not offer a liquidated fair market value for the debtor's assets that the court could use to project how much creditors would receive in chapter 7 in a forced sale, assuming no liens on the property.

Both 5 Talents and Baggott argue for use of a going concern value for the debtor but do not like the going concern value that Mr. McMurray calculated. In its closing brief 5 Talents couples two facts to imply that Mr. McMurray's going concern valuation is untrustworthy: Mr. McMurray served as the debtor's expert in the arbitration proceeding, and the debtor's claims for damages in that proceeding are far more than the values Mr. McMurray arrived at in his report. Specifically, 5 Talents cites the interim arbitration award to show the debtor asserted claims for damages for violation of the Lanham (Trademark) Act of $631,174.24, for breach of provision not to compete of $430,527.32, and for breaches of the franchise agreements of $408,748.54. The claims were all denied because the debtor was found to have breached the franchise agreements by terminating them without providing for a cure. Unawarded claims for damages do not translate into value for an insolvent company. 5 Talents also refers to the balance of $275,000 awarded to the debtor from 5 Talents that represents amounts owed under the parties' asset purchase agreement for the Bristol franchise as the amount of "goodwill for a single franchise." That the parties allocated $100,000 of the $375,000 purchase price to assets and $275,000 of the purchase price to goodwill is not definitive of the actual values. But if it were, that transaction occurred in 2019. There is simply no evidence that Mr. McMurray's methodologies or the data he utilized as an expert in the arbitration proceeding are inconsistent with the methodologies and data he used as an expert in this bankruptcy case.

5 Talents did not call an expert witness but sought to provide an alternative to Mr. McMurray's valuation of the debtor through the lay opinion testimony of one of the owners of 5 Talents, Brett Greene. Mr. Greene sought to offer his opinion of the fair market value of the debtor as a "hypothetical purchaser" by testifying as to the amount 5 Talents might offer to purchase the debtor if 5 Talents were to make such an offer. 5 Talents averred that Mr. Greene—

36

as a competitor of the debtor with experience in the industry—could provide testimony as to his opinion of the debtor's value.

Mr. Greene does have experience in the industry.   He testified that he and his wife and another couple are the owners of 5 Talents.   He said 5 Talents does business under the trade name of Your Home Pros and described the nature of the business as follows:

> Under that brand we do small home repair and remodel, we do home additions, we're a general contractor by licensure, and we also carry an electrical contractor's license, so we do quite a bit of that work.   We have a painting crew. Pretty much anything you can think of under general contracting, we do.

Prior to using the Your Home Pros brand, 5 Talents operated as a franchisee of the debtor.   Mr. Greene said that the business currently serves "the upper northeast Tennessee area, we go as far west as basically Jonesborough, as far south as Unicoi County.   We go into southwest Virginia up into Abingdon, Gate City.   So Tri-Cities and Southwest Virginia is what [we] define our area as."   In other words, 5 Talents competes in the areas of the Honey Do franchise territories presently serviced by Crewbuilt Fixology.   While Mr. Greene has experience in the industry as a prior franchisee of the debtor and now as a competitor of the debtor's franchisees, he is not and has never been an owner or operator of the debtor as would be required to present lay opinion testimony as to value.  *See, e.g., JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525 (6th Cir. 2004) (citing Fed. R. Evid. 701, Advisory Committee Notes for the 2000 Amendments).

Before the confirmation hearing began the debtor filed a motion in limine seeking to prevent Mr. Greene's testimony as to the debtor's value but the court deferred ruling on the motion until 5 Talents sought to offer the lay opinion testimony the debtor was anticipating.   At the time the lay opinion testimony was offered the court determined that Mr. Greene's testimony was inadmissible under Fed. R. Evid. 701, which prohibits a lay person's opinion testimony unless it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

37

"Subsection (c) was added to this rule in 2000 in order to 'eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *Id.* 5 Talents' attempt to present Brett Greene as a lay witness with expertise in the debtor's industry was exactly what Fed. R. Evid. 701(c) was designed to preclude. As the court stated in its order granting the debtor's motion in limine:

> Mr. Greene had neither been qualified to testify as an expert on the issue of the debtor's value, nor had he made an actual offer to purchase the debtor. Mr. Greene's personal knowledge of the debtor and its business operations was presented as being equivalent to that of an owner of the debtor because, as it was explained, Mr. Greene gained his knowledge initially as a franchisee of the debtor and then subsequently from running a similar business to that of the debtor. However, Mr. Greene was never employed by or directly involved with the debtor's business operations. Mr. Greene lacked the "the requisite first-hand, personal knowledge" of the company about which he sought to opine a value. Never being an owner, officer, or director of the debtor, Mr. Greene had no basis on which to offer lay testimony about the debtor's value. *See JGR, Inc. v. Thomasville Furniture Indust., Inc.*, 370 F.3d 519, 525-26 (6th Cir. 2004). In short, Mr. Greene's personal knowledge gained from his background of "experience and dealings" with the debtor provides no exception under Fed. R. Evid. 701 for his lay testimony of the debtor's value.

5 Talents appears to have considered the risk of not retaining its own expert witness to value the debtor, as its attorney stated in opening: "We are going about this in unique circumstances, particularly with this part of the objection, because typically this is a battle of experts." The creditors did not attempt to offer any other evidence regarding the debtor's value aside from Mr. Greene's testimony. Without expert testimony or lay testimony from an owner or operator of the debtor, the creditors have offered no admissible evidence to contradict Mr. McMurray's valuation of the debtor.

Consequently, the only credible evidence the court has regarding the debtor's value is Mr. McMurray's going concern value of $48,000 driven primarily by the intangible assets of the company and the debtor's $52,110.53 value of tangible assets of which some could generate

38

proceeds in a forced sale.[12]    The amount of unsecured debt addressed by the debtor's plan is $1,597,169.05, consisting of $214,372.23 for Class 3 and $1,382,796.82 for the Class 4 claim of 5 Talents.   5 Talents will receive $32,607.49 and Class 3 will receive the remaining balance of $5,041.71 because the plan's $37,653 distribution to unsecured creditors is split 13.4% to Class 3 and 86.6% to Class 4 (as calculated in note 5).   Baggott's claim of $58,181.94 is 27% of the total for Class 3, so it will be paid $1,362.61 under the plan.   Because the SBA has a blanket security interest encumbering all the debtor's tangible and intangible personal property securing payment of its $512,708.66 claim, 5 Talents and Baggott would receive no payment under a hypothetical chapter 7 liquidation regardless of if the debtor were being sold as a going concern or the debtor's assets were being sold in a forced sale.[13]

5 Talents asserts that the SBA should be treated as an unsecured creditor in the liquidation analysis because a hypothetical chapter 7 trustee could avoid the debtor's 2024 security agreement with the SBA.   The chapter 7 trustee's avoiding powers in a hypothetical case may affect a

---

[12] The debtor's liquidation analysis of assets that possibly could be liquidated includes bank accounts, accounts receivables, uniforms, office equipment and furniture, and a trailer that were collectively valued at $52,110.53.   The analysis also listed an "IRS Earned Retention Credit" of $31,832.32, its leasehold interest valued at $1, and the "[p]resent value of net cash flow of $128,085 over 36 months at a 9% discount rate."   The debtor has since learned that it is not eligible for the tax credit.   As for cash flow, there would be none to consider in a forced sale because the debtor would no longer be operating.   The franchise contracts themselves would be of no value because a chapter 7 trustee could not assume and assign them without curing defaults and providing adequate assurance of future performance, and that is not possible without an operating franchisor.   And the estate would then have claims from the franchisees that could double the pool of unsecured debt.

[13] The parties stipulated that the SBA has a blanket security interest encumbering all the debtor's tangible and intangible personal property securing payment of its claim.   The grant covers the proceeds from the sale of the debtor as a going concern as both the security instrument and the UCC filing statement describe the SBA's collateral as "property that Borrower/Debtor now owns or shall acquire or create immediately upon the acquisition or creation thereof" including "tangible and intangible personal property" and "all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof…."

39

liquidation analysis.   *See In re Tenderloin Health*, 849 F.3d 1231, 1237 (9th Cir. 2017) (quoting Collier on Bankruptcy ¶ 1129.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016).   In this instance, however, there is a major problem with 5 Talents' assertion that the SBA should be treated as unsecured in a hypothetical liquidation because nothing has been presented that tends to show that the SBA's lien perfection would be avoided.   But even if the SBA were unsecured, the chapter 7 distribution still would not exceed the amounts of $32,607.49 and $1,362.61 that 5 Talents and Baggott will be paid under the plan such that the plan still meets the best interests of creditors test.   In fact, 5 Talents and Baggott fare better under the plan if the SBA is secured than they would if it is unsecured as illustrated by the following hypothetical.

If the case were converted to chapter 7 and an appointed trustee sought to avoid the perfection of the SBA's lien, the trustee would immediately be faced with an illiquid estate and the daunting tasks of both funding the operation of the business and litigation with the SBA.   The trustee would need an order in the bankruptcy case permitting the sale free and clear of the SBA's lien and a final judgment in an adversary proceeding avoiding the SBA's secured status.   The SBA would likely contest the avoidance action, so the estate's administrative expenses for the litigation would be at least $25,000.   The estate would also have the administrative expense associated with operating the business until it could be sold as a going concern.   A sale would need to be made promptly to minimize those expenses, so the trustee would likely have to accept an offer somewhat less than market value.   But let's imagine that a sale could be made for $100,000 or twice as much as Mr. McMurray's valuation.   The estate would then have the brokering and closing costs as administrative expenses that would average 15% of the sales price. And in addition to the litigation and operational expenses, the administrative expenses from chapter 11 would have to be paid that includes those of the subchapter V trustee and that of the debtor's attorney that the debtor estimates to be $15,000.   If any proceeds were left to distribute, the trustee's commission would be deducted.

On the claims side, with the inclusion of the $512,708.66 unsecured claim of the SBA and the $78,538.91 unsecured claim of Mr. Fluke, the hypothetical chapter 7 unsecured creditor pool would swell from $1,597,169.05 to $2,188,416.62.   5 Talents' claim would then be 63% of the

pool and Baggott's claim 2.6% of the pool.    To exceed the amounts of $32,607.49 and $1,362.61 that 5 Talents and Baggott will be paid under the plan, the hypothetical chapter 7 trustee would have to distribute more than $51,757.92 to creditors.    Neither a sale as a going concern nor a sale of the assets individually will generate such a distribution in chapter 7.    The debtor has met its burden under 11 U.S.C. § 1129(a)(7).

  E. <u>Whether the Plan is Feasible</u>

  Section 1129(a)(11) requires a showing by the debtor that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization."    "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."    *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (citations omitted).    Baggott asserts in its post-hearing brief that "[t]he plan of reorganization is not feasible and was not proposed in good faith" because "the Debtor's projected revenue [shown on the exhibit to the plan] commits 100% of the Marketing Fund revenue … to general operating funds."    The exhibit shows that projected revenue from the Marketing Fund is less than 25% of the debtor's total projected revenue and not the "almost one third" Baggott claims.    Furthermore, there is no limitation on the debtor's utilization of 100% of the Marketing Fund each year.    The mechanics of the Marketing Fund are described under Item 11 of the debtor's FDD:

> Each franchise outlet is required to contribute 2% of Gross Revenue to the Marketing Fund. The Fund will be used for national and/or regional advertising, publicity and promotion relating to Honey Do Service Businesses. We will determine, in our fully unrestricted discretion, the manner in which the Marketing Fund will be spent.   Some portion of the Marketing Fund may be used for creative concept production, marketing surveys, test marketing and related purposes, and a portion of the Marketing Fund may be used to develop and maintain the websites….
>
>  ….
>
> We have the right to reimburse ourselves out of the Marketing Fund for the total costs (including indirect costs) of developing, producing and distributing any marketing materials, collecting the Marketing Fund Fee (including attorneys', auditors' and accountants' fees and other expenses incurred in connection with

collecting any Marketing Fund Fee) and an administrative fee to cover our services, salaries, supplies and overhead expenses….

…. Funds from the Marketing Fund Fees paid will be kept separate and distinct and will be accounted for separately from our other funds. These funds will not be used to defray any of our general operating expenses, except as described in the paragraph above. Any monies remaining in the Fund at the end of any year will carry over to the next year.

Article 5 of the sample franchise agreement attached to the disclosure document provides in pertinent part that:

(b) You [as a franchisee] agree that the Fund may be used to meet any and all costs of maintaining, administering, directing, and preparing national and/or regional marketing materials, programs and public relations activities (including, without limitation, the cost of preparing and conducting television, radio, magazine, billboard, newspaper, direct mail and other media programs and activities, for conducting marketing surveys, test marketing, employing advertising agencies to assist therewith, and providing promotional brochures, coupons and other marketing materials to all franchisees of the System), and a portion of the Fund may be used to develop and maintain our website. The Fund shall be accounted for separately from our other funds, and shall not be used to defray any of our general operating expenses, except for such reasonable administrative costs and overhead, not to exceed ten percent (10%), as we may incur in activities reasonably related to the administration or direction of the Fund and its marketing programs. Any monies remaining in the Fund at the end of any year shall carry over to the next year[.]

Baggott insists that the foregoing provision "caps [the debtor's] use of the marketing fund revenue for 'reasonable administrative costs and overhead' at 10%." But the cap only applies to the defrayment by the debtor of its "general operating expenses" for the reasonable administrative costs and overhead that the debtor "may incur in activities reasonably related to the administration or direction" of the fund and its programs. (Emphasis supplied.) The cap is no limit to the debtor's use of the fund to "meet any and all costs of maintaining, administering, directing, and preparing national and/or regional marketing materials, programs and public relations activities" and the debtor's use of "a portion of the Fund … to develop and maintain … [its] website."

42

The debtor's costs that are reimbursed from the Marketing Fund are largely attributable to the debtors' employees' work on marketing activities, so it can be expected that a significant portion of the Marketing Fund goes to fund employees' wages.  This appears to have initially created some confusion when 5 Talents attempted to compare the yearly payroll expenses of $259,807 on the debtor's annual profit and loss statement for 2023 that was attached to the petition with the debtor's projected disposable income analysis that was attached to its plan showing the debtor's projected annual payroll to be $500,112.  Mrs. Fluke explained that as much as 95% of the $155,556 in marketing expenses on the profit and loss statement was attributable to costs for employees' wages.  For a more accurate comparison, if 95% of the marketing expenses or $147,778 is added, the payroll total for 2023 would be $407,585 versus the projected $500,112 in payroll.

Mrs. Fluke testified that the marketing fund is only used for the costs of wages when employees perform tasks permitted by the franchise agreements.  Mrs. Fluke stated she understands that franchisees often sue franchisors for misuse of marketing funds, so she is careful to ensure that all reimbursements from the fund are proper.  While explaining what she believes the marketing fund can and cannot be used for, Mrs. Fluke testified:

> It can be used for expenses for promoting the brand for the benefit of the franchisees for lead generation, for above and beyond what the franchisees may do themselves. It may be used for website development, hosting, strategic planning of advertising in any area.   There are lists of what it can be used for.   It cannot be used by Honey Do to sell franchises, it cannot be related to generalized support of franchisees–like general financial support.

Mrs. Fluke also described a process for reviewing tasks to ensure they meet the marketing fund requirements. The debtor's employees submit timecards listing the tasks they complete.  A separate employee reviews and enters the time to verify its accuracy.  Mrs. Fluke then reviews the timecards before transferring funds from the marketing fund account.  Additionally, she reviews monthly profit and loss reports to ensure expenses are properly categorized, and commented that "I have spoken with counsel many times to make sure what I have done falls within the guidelines."

43

Notably, the first paragraph describing the marketing fund provides the debtor with the "sole discretion" in establishing, maintaining, and administering the fund. The debtor's understanding of the appropriate uses of the marketing fund and its significant efforts to ensure that the reimbursement of costs from the fund fall within the terms of use described in Article 5 evidence that the debtor's use of projected revenue to fund its plan is appropriate. No franchisee has complained that the debtor has inappropriately used the marketing fund during this bankruptcy or filed a claim based on prepetition misuse of the marketing fund.

Mrs. Fluke testified that the debtor would do everything it could to make plan payments and that she did not believe future reorganization would be necessary. Mr. McMurray testified that he thought the projected income and expenses compiled by the debtor were reasonable and feasible, especially if new franchises are added and current franchises perform well. The debtor having shown that its plan is not likely to be followed by liquidation or the need for further financial reorganization, the requirements of § 1129(a)(11) have been met.

F. Whether the Plan does not Discriminate Unfairly and is Fair and Equitable

If all the applicable requirements of § 1129(a) other those in paragraphs (8), (10), and (15) are met, §1191(b) states that "the court, on request of the debtor, shall confirm the plan … if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." "While the standards for unfair discrimination under § 1191(b) are the same as under § 1129(b)(1)—which is applicable to other chapter 11 cases—what is 'fair and equitable' with respect to unsecured creditors in a subchapter V is determined under the requirements of § 1191(c), *not* § 1129(b)." *In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. at 812.

Unfair discrimination is not defined in the Bankruptcy Code but, "[g]enerally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (quoting *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)). Courts in the Sixth Circuit generally apply the "Markell test" in evaluating unfair discrimination. *See In re Lapeer Aviation, Inc.*, 2022 WL 7204871, at *8.

44

> Under this approach, a rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) [a] dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Id.* (quoting *In re Dow Corning Corp.*, 244 B.R. at 710). In the parties' joint prehearing statement, whether the plan discriminates unfairly was not stipulated as an issue to be decided by the court. Nevertheless, 5 Talents in its closing brief remarked that the "plan unfairly discriminates against 5 Talents' claim because it would receive a greater share of the disposable income if the SBA was treated as an unsecured creditor." In discussing the debtor's good faith in proposing its plan, the court has already noted that sufficient facts are not in the record to conclude the debtor's transfer of the security interest in connection with the assumption agreement or its perfection in Tennessee would enable the SBA to receive more than it would if the transfer had not been made and the SBA were to receive payment of its debt under chapter 7. But even if it were likely that the transfer is avoidable, the question of whether a plan discriminates unfairly is not a hypothetical undertaking. A court determines whether a plan unfairly discriminates by the facts as they presently exist. The plan separately classifies the SBA's allowed secured claim and 5 Talents' allowed unsecured claim. Section 1122(a) requires separate classification because the claims are not substantially similar. Because the two classes are dissimilar, the plan does not discriminate unfairly between the treatment of the SBA's class and that of 5 Talents.

The fair and equitable test under § 1191(c) pertaining to unsecured creditors first requires that the plan provide "that all the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan."[14]

---

[14] Alternatively, if property is to be distributed under the plan, its value must not be less than the projected disposable income of the debtor over the same period. See 11 U.S.C. § 1191(c)(2)(B).

11 U.S.C. § 1191(c)(2)(A). Second, the test requires either that "[t]he debtor will be able to make all payments under the plan" or "there is a reasonable likelihood that the debtor will be able to make all payments under the plan" and "the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims … in the event that the payments are not made." 11 U.S.C. § 1191(c)(3)(A) and (B). The latter requirement "fortifies the more relaxed feasibility test that § 1129(a)(11) contains." *In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020).

Starting with the second requirement, Mrs. Fluke was presented with the debtor's monthly reports filed in July 2024 through August 2025 covering the debtor's operations over the 13 and one-half months it had been in chapter 11. The total cash flow during this time was a positive $40,652.68. Mrs. Fluke was asked what she thought the reports indicated with respect to the feasibility of the plan. She explained that they show that revenue and expenses fluctuate throughout the year. "At the end of the day, there are some months where I am negative on cash flow, other months I am not. This is the time of year right now that royalties are better." Mrs. Fluke said that overall "it shows that I am able to make the payments I said I would make. Honey Do Franchising Group can make the payments it said it would make." Mrs. Fluke said that several fees the debtor was currently paying were temporary, namely those fees for the debtor's attorney, its expert witness, and the subchapter V trustee.

Baggott questioned Mrs. Fluke about what would happen if the total cash flow from June, July, and August of 2024, the months prior to the debtor's proposed plan, of $40,813.84 were removed. Excluding those months the debtor would result in a negative cash flow of $161.16. Mrs. Fluke said, "I don't know if you can just exclude historical data and get a big picture of it," and went on to explain:

> I have not had to put money into the company; it has paid all of its bills, carried over. Whatever the cash flow says, it can be negative one month, and it can be in the positive the next. Looking at the ending balance and beginning balance month-to-month, there is some in reserves to pay the bills coming in even if the expenses for that month exceed the revenues coming in. So it's not lost money.

46

Asked again whether there is a negative cash flow from September 2024 through July 2025, Mrs. Fluke responded, "Maybe, but I mean, you could look at November, December, and January of 24 and 25, and it looks like I'm sunk.   Because of the negative cash flow for those months, you have to account for the months where its more to overcome that."   The court sees no logic in excluding certain months of the debtor's operations when the question is whether projected revenue is soundly based on historical performance.   Baggott's cross-examination only reinforced Mrs. Fluke's testimony that the debtor's revenue is less in the winter months such that it must reserve cash in its more profitable months to pay expenses in the less profitable ones.

The monthly operating reports show the ebbs and flows of the debtor's business operations. The $40,652.68 positive net cash flow from those operations evidences that the debtor will likely be able to make all payments under the plan to the unsecured creditors as projected.   The court uses the term "likely" because the debtor has not made monthly payments to the SBA during the bankruptcy.   Those annual payments total $30,144 under the plan.   However, that yearly amount is considerably less than the amount of fees the debtor has paid to professionals.   Mrs. Fluke testified from Exhibit 38 that the fees paid over the same 13 and a half months to professionals totaled $66,744.23, with all but $11,301 going to pay debtor's bankruptcy attorney and the subchapter V trustee.   Mr. McMurray's retainer as an expert was $3,700 of the $11,301. Considering the debtor's historical performance and taking into the account that the debtor's obligations for professional fees should be minimal when performing under the plan, "there is a reasonable likelihood that the debtor will be able to make all payments under the plan."   11 U.S.C. § 1191(c)(3)(B)(i).

Under this standard the plan must have in place "appropriate remedies … to protect holders of claims … in the event that the payments are not made."   11 U.S.C. § 1191(c)(3)(B)(ii).   The only example of  an "appropriate remedy" provided under the provision is "the liquidation of nonexempt assets," of which there are none in this case.   Instead, the debtor's plan provides as remedies that "[i]n the event of default and failure to cure after nonconsensual confirmation under § 1191(b), creditors may petition the court for relief from the automatic stay due to the Debtor' [sic] default, or they may petition the Court for dismissal or conversion of the case to one under

47

Chapter 7." Other courts have found similar remedies appropriate. *See In re Frontline Med. Servs. LLC*, No. BAP CO-25-009, 2025 WL 2754614, at *11 (B.A.P. 10th Cir. Sept. 29, 2025). As previously discussed, the court believes that the plan is feasible and that there is a reasonable likelihood the debtor will be able to make all payments under the plan. Because the plan provides appropriate remedies in case of default, the only issue remaining is whether the plan is distributing all the debtor's projected disposable income and whether the term of the distribution should be greater than 3 years.

Subsection (d) of § 1191 states that "the term 'disposable income' means the income that is received by the debtor and that is not reasonably necessary to be expended—

(1) for—

    (A) the maintenance or support of the debtor or a dependent of the debtor; or

    (B) a domestic support obligation that first becomes payable after the date of the filing of the petition; or

(2) for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor."

A significant portion of the trial focused on the accuracy of the financial projections of the debtor prepared by Mrs. Fluke to estimate the debtor's disposable income over the next three years as shown in the plan's Exhibit B. The debtor earns revenue through multiple methods. It charges a new franchisee an initial fee of $29,000, a territory fee that varies from $19,000 to $63,000 depending on the area's population, and an initial training fee of $5,000. The debtor may offer discounts or help the new franchisee finance these fees, and Mrs. Fluke indicated that debtor financing of these initial fees is common. Once a franchisee is established, the debtor collects a royalty of 6% of the franchisee's gross revenue with the royalty decreasing after the franchisee pays $1 million to the debtor. Additionally, 2% of a franchisee's gross revenue goes into the Marketing Fund. The debtor also earns a small amount from a Shopify account, primarily through selling branded merchandise like uniforms to the franchisees. The debtor's projected disposable income on the first page of Exhibit B is reproduced below.

48

| Periods in Months | Projected Income | Projected Expenses | Disposable Income | SBA Annualized Total Payments | Amount Available to Distribute to Classes 3 & 4 |
|---|---|---|---|---|---|
| 1-12 | $850,427.00 | $808,890.00 | $41,537.00 | $30,144.00 | $11,393.00 |
| 13-24 | $859,196.00 | $820,755.00 | $38,441.00 | $30,144.00 | $8,297.00 |
| 25-36 | $939,519.00 | $891,412.00 | $48,107.00 | $30,144.00 | $17,963.00 |

The Debtor's projected expenses do not include payments to Class 2, The Small Business Administration (SBA), in the amount of $2512.00 per month ($30,144.00 per year).

The [debtor's] projected expenses do not include ongoing professional and administrative expenses.

The second page of Exhibit B is the debtor's projections of revenue and expenses by month for 2025. The creditors believe that these projections are inaccurate. For months 1-12 of the projections, Mrs. Fluke primarily relied on the 2023 tax return and 2023 year-end profit and loss statement to estimate income at $850,427 and expenses at $808,890. Mrs. Fluke accounted for employee raises and other rising costs in the expenses. Mrs. Fluke projected for months 13-24 that revenue from royalties would increase by 1% and expenses would grow by 1.5%. For months 25-36, Mrs. Fluke stated:

> [T]here's a bigger jump there. I am looking at year three, being able to sell two franchises. I do believe that the only way at the beginning to sell is to finance, so I looked at that at financing both franchises and then put a minimal down payment towards it and increasing the revenue from the two franchises that would come in year three. With the expenses going up in year three, I'm hoping I can bring on a full-time franchise development, either full-time franchise development or someone that does franchise development and more in marketing to be able to help. So that's looking at adding on another salary.

5 Talents describes Mrs. Fluke as being vague in her projections. Asked how she came up with the numbers, Mrs. Fluke responded that "I looked at the 2023 tax return and projected hopefully an increase in income in the next year, and also increasing expenses over the next three

years."    In describing the adjustments she made, Mrs. Fluke said that "[f]or expenses–I used the overall expenses and tried to add in another employee and for sales."    When presented with the tax return and asked which specific numbers she used, Mrs. Fluke answered, "Different expenses, total deductions, I can't say specifically which numbers I used to create the projections." However vague Mrs. Fluke's remembrance, the court will accept the projections because there was nothing elicited to show that they are not sound.    Furthermore, the projections are supported by the testimony of Mr. McMurray.    While reviewing the projections in the plan, Mr. McMurray was asked if "[b]ased upon your analysis, do you think the projections that are here for disposable income, and the amounts that are available to pay creditors are feasible?"    Mr. McMurray's response was: "My disposable income figure would be pretty close to that.    I think in my analysis I had both the income and the expenses as lower, but disposable income I was coming in little lower than theirs, but pretty close."    He also added that "[i]t is feasible based on what they've been able to do in the past."

5 Talents though Mr. Greene's testimony also challenged the reasonableness of the debtor's expenses.    5 Talents has never been engaged in the business of a franchisor but instead competes in the same areas with franchisees of the debtor.    In many instances Mrs. Fluke justified the expenses Mr. Greene called into question.    For example, Mr. Greene objected to the debtor's use of a desktop version of QuickBooks instead of QuickBooks Online, stating "Online QuickBooks is a fraction of the cost and is much more user-friendly."    When asked about this expense, Mrs. Fluke explained:

> We currently use the desktop enterprise version, which costs roughly $8,000 a year. The online version does not offer the reports we use in the systems: the ability to run profit and loss by job, which is one of the key indicators for franchisees to know where they are in the business.    Online desktop is $99/month per user, if you just take $99 times each franchise, I'm going to say 10 just for simplicity, that's $990 a month, so for a year we're looking at just under $12,000.    That's even more expensive than what I pay for desktop enterprise.

Giving due deference to the debtor's business judgment concerning the expenses that are necessary and reasonable for a franchisor, Mr. Greene's testimony did not persuade the court that the projected expenses are unreasonable.

50

The creditors also questioned whether it was reasonable for the debtor to only project new franchises in the third year.  Baggott suggested that the debtor had not timely updated its FDD intentionally to sabotage its revenue from the sales of new franchises.  The Flukes testified that they were hoping and waiting for confirmation of a plan so that an updated disclosure would include that the debtor was operating under a confirmed plan.  Due to the lengthy confirmation hearing process, the debtor nevertheless proceeded to engage an accountant to prepare audited financial reports for an updated FDD.  The Flukes' explanation for the delay was reasonable.  It is certain from their testimony that the debtor intends to market franchises in the future. Regarding the debtor's reason for only predicting sales in the third year, Mrs. Fluke explained, "We never know when we are going to sell one, it's been a struggle in the past and I think it will be harder to sell in the future with the bankruptcy disclosed in the FDD."  When Mrs. Fluke was asked about Brandon Hill, who purchased a franchise in January 2025 for the area of Carey, North Carolina during the debtor's bankruptcy case, she replied, "We answered his questions, he received the FDD, I'm not sure why he was comfortable. [The] majority of prospective franchisees see the FDD and say 'no thank you.'"  But during this same time David Tolbert, another franchise owner, indicated he no longer wanted to operate in the Kingsport and Johnson City territories, prompting Mrs. Fluke to establish Crewbuilt Fixology to handle estimates and projects in those franchise territories while negotiating Mr. Tolbert's exit.

Mrs. Fluke stated that she believed the bankruptcy would need to be reported on the debtor's FDD for 10 years.  When asked why she thought it would not be an obstacle in the third year for making a sale, she said, "I'm just very hopeful we will be able to make a sale."  She went on to explain that "[f]rom the time of someone inquiring about buying a franchise, it can take three or more months to make a sale.  Once they sign a franchise agreement, it can take three to six months before they start producing any kind of royalties."  Mrs. Fluke expressed more confidence in the revenue stream from royalties from the debtor's existing franchisees rather than from the sales of new franchises. "This is my best guess as to projected income."  She suggested that the growth rate is equivalent to netting a new franchise every 18 months, acknowledging that the debtor may gain and lose franchises over time.  This aligns with the debtor's experience during

51

the bankruptcy, as they gained a franchisee from Mr. Hill but lost two from Mr. Tolbert.  Mr. McMurray also stated that he believes these projections for adding franchises are reasonable.

In its closing brief, 5 Talents states that "the operating reports show considerably different figures than the projections, starting with the Debtor's income."   Having the benefit of hindsight, 5 Talents observes that the plan projections for income made in September 2024 for January through July 2025 were lower than the actual income in the operating statements for those months. 5 Talents concludes that with a "disparity" of $75,000 between projected and actual, the only way the debtor was "able to remain in business with so much less income than in its confirmation projections" was because "the Debtor's projections also overstated expenses."   But that is the very nature of projections.  Adding in the historic ebb and flow of the debtor's revenue and expenses throughout the year, the court would not expect projections to be spot-on.  5 Talents asks the court to accept that this "issue regarding the Debtor's 12-month projections would then extend to the projections for the entire proposed commitment period."   The court will not make this conjecture based only on a 7-month window of actual revenue.

5 Talents contends that a comparison of the debtor's projections with its year-end 2023 profit and loss statement "shows considerably more available income."   After adjusting for the inclusion of recurring legal expenses and the removal of nonrecurring ones, 5 Talents asserts that the profit and loss statement "would have yielded net income of $111,444.83."   5 Talents says it found "some of the reasons for this discrepancy" in the greater annual expenses projected for payroll and rental expenses.  But 5 Talents' specific objection was to an expense of $23,500 for the debtor's sponsorship of its annual conference for franchisees and to the "expenses directly related to the sale of new franchises."

5 Talents states that the annual conference expense is excessive because the debtor only spent $5,012.02 for the 2025 conference.  Mrs. Fluke testified that the past cost for a conference held in another state has averaged around $20,000, including the accommodations for franchisees, that is primarily paid from the marketing fund with the franchisees' knowledge.  She said the debtor initially considered not hosting one for 2025 but decided it was too important for the

52

franchisees not to host one.   Mrs. Fluke explained regarding the cost that the 2025 conference was held locally in Bristol, and by doing so they were able to keep expenses down.   Even so, Mrs. Fluke said that she and Mr. Fluke personally contributed about $10,000 toward the costs of the convention.      That being the case, the costs for hosting the 2025 conference event locally still exceeded $15,000.   Based on Mrs. Fluke's statements regarding the importance of the annual conference for maintaining the debtor's relationships with its franchisees and the inference that the expenses projected for its annual conferences are necessary and only slightly more than the normal historical average, the projected expenses are reasonable.

Concerning the expenses directly related to the sales of new franchises, 5 Talents identifies two categories, "FDD Attorney" and "Lead Generation."   The first is the expense of $18,000 for the annual update of the FDD, and the second is the expense of $59,320 in generating leads for sales of new franchises.    5 Talents acknowledges that the expense related to the sales of new franchises "might be necessary and reasonable expenses."   However, it maintains that because "the Debtor's projections included no income from the sale of franchises and commits no income from the sale of franchises to creditors," the expenses "reduce the Debtor's available income for creditors, while benefitting the Debtor's owner through the sale of additional franchises."   As a franchisor it is necessary for the debtor to market and sell franchises.   The debtor must have an annually updated FDD and lead generation to do so.

The court agrees with the debtor that its financial projections are reasonable and soundly based on historical performance.   Accordingly, the plan is distributing all the debtor's projected disposable income.   The remaining question is whether the period of distribution be the 3-year term the debtor has proposed or a greater term.   One court observed that "[t]here is a split of authority as to whether § 1191(c) contains a presumption that a three-year payment period is fair and equitable, which the court can extend upon a showing of unusual circumstances, or whether, upon objection, the debtor has the burden to prove that the minimum plan length is fair and equitable, regardless of the existence of unusual circumstances."   *Matter of Edgewood Food Mart, Inc.,* 666 B.R. at 438 (comparing *In re Urgent Care Physicians, Ltd.*, No. 21-24000-BEH, 2021 WL 6090985, at *10 (Bankr. E.D. Wis. Dec. 20, 2021) with *In re Trinity Fam. Prac. & Urgent*

53

*Care PLLC*, 661 B.R. at 815-16)).    But on either side of the split, "courts have essentially applied a totality of the circumstances analysis, which considers the specific facts of the plan and the debtor's financial situation, viewed against the backdrop of the Congressional purpose in enacting Subchapter V—that Subchapter V be quicker and easier for small businesses."  *Id.* (citations omitted).    Undertaking a totality of circumstances analysis here, or looking at the big picture in other words, the court recognizes five unusual factors that each weigh against the minimum 3-year term, whether presumptive or not, and that considered together conclusively require the maximum 5-year term.

First, 5 Talents correctly points out that under a 3-year plan the $230,000 projected expense over that term for lead generation and the FDD is being borne by the unsecured creditors with little to no benefit for them in net revenue.   Mrs. Fluke said that the growth rate for projected income was equivalent to gaining a new franchise every 18 months, which is one new franchise over a 3-year term.   Mrs. Fluke thought that such a sale may not occur until the third year and said that it may take three to six months thereafter before a new franchise starts to produce any royalties. The yearly expense of $59,320 for lead generation is six times greater than the $9,689 expense listed on the debtor's year-end 2023 profit and loss statement.   While the court does not question the debtor's business judgment for the amount it has allocated, the significant increase does reinforce 5 Talents' position that the creditors are now having to bear a much greater burden under the projection of expenses than the debtor was incurring prior its bankruptcy filing.   Unlike a 3-year term, a 5-year term may likely result in shifting some of the benefit from the sales of new franchises to unsecured creditors.

Second, increasing the compensation to the Flukes on the eve of bankruptcy, even if well-deserved, was ill-timed.   It shows that the debtor did not consider belt-tightening prior to its entry into bankruptcy.   The lack of consideration thereafter is evident by the projected increases in payroll, by far the debtor's largest category of expenses, for a new employee in addition to raises to existing employees (other than the Flukes).   The expense of $70,000 for the additional employee is almost double the distribution to unsecured creditors over a 3-year term.   And the new position is for franchise development, i.e., to market and sell new franchises, that could hardly

benefit the unsecured creditors under a proposed 3-year term as discussed above.    Again, the unsecured creditors are being called on to bear an expense the debtor has not incurred in the past.

Third, the debtor leases its commercial property essentially from the Flukes as they own the lessor company.   Mrs. Fluke stated that the property is 7,500 square feet total and that comes to about $2.32 per square foot for the monthly rental payment of $1,935.90.   With the square foot figure, the court assumes that the debtor is only occupying a small portion of the overall building space.   The debtor's expense projection for monthly rental under the lease almost doubles from $1,935.90 to $3,800, apparently based on the following provision:

> Lessee has received a discounted rental rate as to the amount of rent that would be charged for the Premises in fair market value.   Lease Payments. the rent amount shall be $1935 monthly upon Possession and until such time that Lessor improves the property to accommodate a training center and break room.   As notice is given of such improvements, the rent will increase to $3,800 monthly.   In addition, at such time that Lessor improves the property to accommodate fully functional offices including a conference room, rent shall increase to $4,800 monthly and remain until the expiration of the term.

Mrs. Fluke stated that the first stage was completed before the confirmation hearing began in May 2025 but the monthly operating reports show the rental payment has not increased yet.

The term of the lease expires April 30, 2026.   The renewal provision states that "Lessee shall have the option to renew this Agreement by providing at least ninety (90) days' notice before any ending termination date…. The terms and conditions of the renewal period, including duration, monthly rental rate and other financial obligations hereunder, shall be negotiated during the ninety (90) days prior to the termination of the Lease."   The court assumes that the rental rates as stated in the original lease will not change on renewal.   An increase to $3,800 per month would be about $4.56 per square foot according to Mrs. Fluke.   She testified that comparable office space would cost $10 to $15 per square foot.   Mr. Greene testified that he believed the debtor could operate in a smaller space.   To the extent she could operate with less space, Mrs. Fluke explained that given the price per square foot, the debtor could still pay more while occupying less space.   The court sees no reason to interfere with the debtor's business judgment to assume the lease.   However, the almost doubling of the debtor's rent by the Flukes for the 3-year term of the plan when they could

55

have chosen to defer the increase until after the plan was completed takes away more than $67,000 in disposable income that could have been directed to payment of the unsecured claims or double what 5 Talents is receiving under the 3-year plan term.   Once again, the unsecured creditors are presented with greater expenditures over the plan than the debtor has incurred in the past.

Fourth, the circumstances surrounding the debtor's execution of the assumption agreement and security agreement for the SBA shortly before filing bankruptcy were not explained, leaving the court to wonder if there are grounds for challenging the SBA's secured status.   As a result, the court indicated that derivative standing for 5 Talents to bring the avoidance action could be granted postconfirmation if grounds do exist and the debtor chooses not to file the action after demand by 5 Talents.   Because it appears the debtor has already chosen a course not to address the transfer, passing the debtor's obligation of avoiding such transfers to enhance the estate to 5 Talents will require that it bear all the risk and fund the litigation instead of the estate.   The debtor put itself in this position by executing the assumption agreement shortly before instead of waiting until after filing bankruptcy.   If execution of the agreement had no effect on the SBA's secured status as the debtor says, waiting until after bankruptcy to execute the agreement under court authority would have been a better decision.   But if by the debtor's actions the SBA had been left unperfected by the debtor's move to and reincorporation in Tennessee, the perfection shortly before the debtor's bankruptcy filing is enabling the SBA to receive over $90,000 of net disposable income over a 3-year term that otherwise would have been shared by the unsecured creditors.   Over a 5-year term that pot of potential net disposable income grows to $150,000.

Fifth, this bankruptcy case does not fall into the traditional mode where the filing was driven by economic factors that negatively impacted business performance.   Instead, most if not all of the unsecured indebtedness of the debtor was incurred directly or indirectly in its dispute with 5 Talents.   That fact matters when balancing the debtor's need for a quick exit out of bankruptcy against the benefits of a longer term to those unsecured creditors that have borne the effects of the dispute.   The unsecured debt addressed by the debtor's plan, none of which is owed to trade creditors, totals $1,597,169.05.   5 Talents' claim of $1,382,796.82 is of course directly attributable to the dispute.   Baggott's claim of $58,181.94 arose from representation of the debtor

56

in the dispute.   Likewise, so did the claims of the other law firms totaling $82,567.87.   The indebtedness of $18,523 scheduled for Trinity Valuation Consulting Group is for services provided to the debtor in the dispute.   That leaves only the $35.67 claim of the Tennessee Department of Revenue and the indebtedness of $1,500 scheduled for Barry Knepper CPA as definitely being ordinary business debt.   The claim of $53,563.75 for the Regions Bank of line of credit, while having the appearance of ordinary business debt, may have been from draws that were necessary to offset the legal expenses from the dispute.   But even considering the line of credit indebtedness as ordinary business debt, the indebtedness along with that owed to the Department of Revenue and Mr. Knepper are still less than .0034% of the unsecured indebtedness.   And while there was no evidence of how the proceeds from the $500,000 SBA loan were used, they must have either directly or indirectly filled the hole dug in the debtor's cash flow from the dispute with 5 Talents. The debtor's year-end 2023 profit and loss statement lists legal expenses of $612,080.79 that could hardly have been paid from the revenue of the debtor's business operations.   The 3-year plan term pays only a minuscule 2.2% dividend on the claims of those creditors left in the wreckage from the dispute.

The debtor raised some concerns about a plan for longer than the 3-year minimum, one being the effect of including the bankruptcy in its FDD.   Mrs. Fluke said she believed that the disclosure negatively affects the debtor's ability to sell new franchises.   Mrs. Fluke acknowledged the bankruptcy filing would need to be disclosed for 10 years.   Specifically, in the FDD's Item 4 titled "Bankruptcy," a franchisor must disclose not only if it has filed for bankruptcy in the preceding 10 years but also if it has obtained a discharge of its debts during this period.   *See* 16 C.F.R. § 436.5.   Section 1192 of the Bankruptcy Code provides that if a plan is confirmed under § 1191(b) as the debtor seeks here, a discharge will not be entered after completion of the plan. On completion of a plan with a 3-year term the discharge will be entered in 2029, necessitating the disclosure of the discharge under "Bankruptcy" in its FDD until 2039.   A 5-year term plan would extend that disclosure until 2041.   In making such disclosures, the debtor also must list the date that any plan was confirmed.   *Id.*   Operating under a confirmed chapter 11 plan should signal that the debtor is making positive strides in its financial reorganization.   Whether it is 2039 or 2041 before the bankruptcy is no longer listed in the debtor's FDD, the court sees little difference the

57

disclosure of the bankruptcy will have on the debtor's ability to market and sell new franchises.

The other concerns mentioned by the debtor in its closing brief pertained to "needed investment and/or capital expenditures that must be deferred during the three-year plan term in order to meet the plan payment terms." Two examples were "replacing lost employees" and "retaining employees without sufficient pay raises." Other examples were "updating software, particularly 'Fran Connect' at a cost of $5,000.00 to facilitate the collection of royalties, updating tools for website … and increased costs per click for advertising." Lastly, Mrs. Fluke said that paying the membership fee to join the International Franchise Association is being delayed that annually costs $5,000. Considering the factors in favor of a 5-year term, the court does not agree that a further delay of two years concerning these extra expenditures disproportionately harms the debtor.

> One court has suggested the range of options available in fixing the plan term:
>
> At the conclusion of a confirmation hearing involving the court fixing the period of plan payments under § 1191(c)(2)(A), the bankruptcy court can: (1) find that a three-year plan period is fair and equitable and confirm the plan, (2) find that the three-year plan period is not fair and equitable and deny confirmation of the plan, (3) fix a longer plan period not to exceed five years and confirm the plan, or (4) determine it has insufficient evidence to fix the plan period and deny confirmation.

*In re Trinity Fam. Prac. & Urgent Care PLLC*, 661 B.R. at 822. In determining whether the plan is fair and equitable, the court first concluded that the plan as proposed provides that all the debtor's projected disposable income received in a 3-year period is being applied to make payments under the plan and now secondly concludes the plan must extend for a maximum 5-year term. The dilemma then is how the court may confirm the debtor's plan for a 5-year term without evidence of projected disposable income for the final two years.

One means is to fashion a provision for payments over years 4 and 5 satisfying the disposable-income requirement of § 1191(c)(2)(A) that the debtor can choose to accept. The court found that all the debtor's projected net disposable income in the 3-year period is being applied to make payments under the plan. Those yearly projected amounts are $11,393, $8,297, and $17,963. An average of those projections, $12,551, will set a baseline or minimum projection

58

of net disposable income for each of the final two years.    The actual net disposable income exceeding the baseline during those last two years must also be put into the plan to be distributed to unsecured creditors.    As with the first three years, the court concludes there is a reasonable likelihood that the debtor will be able to make these payments over the course of the two additional years.

The court understands that § 1191(b) "makes no mention of a true up of any potential gap between actual and projected income" and "[t]o require that actual income be paid into the plan is to read the word 'projected' out of the statute."    *In re Packet Constr., LLC*, 672 B.R. 905, 908-09 (Bankr. W.D. Tex. 2024).    In discussing the differences between subchapter V and chapters 12 and 13, the court in *Packet Construction* astutely observed:

> Unlike subchapter V, in which only the debtor may seek a modification of the plan, in chapters 12 and 13, the statute may provide a mechanism for payments to be adjusted if projections do not meet reality, one way or the other. The debtor, the trustee, or the holder of an allowed unsecured claim may also seek to modify the plan to provide for higher or lower payments.  The statute is not completely clear on the relevant standards for modification, and accordingly, courts have differed somewhat in the standards they apply.   But in any case, this is the statutory mechanism for how a "true up," if one is merited, can be accomplished under those chapters, but not in subchapter V, except at the request of the debtor and under the conditions provided in section 1193.

> Against this backdrop, it is telling that subchapter V provides no opportunity for any party other than the debtor to seek to modify the plan. The implication appears to be that unless the debtor so chooses, no other party can force it to increase the projected payments to meet the actual income. The debtor may be able to modify the plan to decrease the payments if reality falls short of expectations, but the projected income may be the ceiling for creditors in subchapter V cases.

*In re Packet Constr., LLC*, 672 B.R. at 913–14 (emphasis supplied).    As emphasized, nothing precludes a debtor from proposing to increase the payments of projected disposable income to meet actual income.   The court in *Urgent Care Physicians* confirmed a debtor's plan doing exactly that.   *In re Urgent Care Physicians, Ltd.*, No. 21-24000-BEH, 2021 WL 6090985, at *10 (Bankr. E.D. Wis. Dec. 20, 2021) ("Significantly, however, under both scenarios, if the debtor's profits are greater than expected, the debtor will pay the difference between its *actual* disposable

income and its *projected* disposable income as distributions through the plan, which is more than what the Code requires.").   Accordingly, if the debtor decides to accept this provision along with the other amendments previously mentioned, the plan is confirmable.

III.

Based on the foregoing, an order will be entered contemporaneously with the filing of this memorandum opinion directing the debtor to file within 14 days a statement that it accepts or rejects the changes as required for the plan to be confirmed.   If accepted, the objections by 5 Talents and Baggott to the plan will be overruled and the motion to assume the lease will be granted.   If not, confirmation of the plan and the motion to assume will be denied.

# # #